IN THE CIRCUIT COURT IN AND FOR CITRUS COUNTY, FLORIDA
CIVIL DIVISION

WILLIAM JAKOB, )
)
       Plaintiff, )
)
v. )
) CASE NO.: 2023 CA 001195 A
JP MORGAN CHASE BANK, N.A., )
EXCEEDING GRACE ENTERPRISES, LLC., )
ENTERPRISE TITLE OF TAMPA BAY, INC., )
ENTERPRISE TITLE AFFILIATES, INC., )
AS GENERAL PARTNER OF ENTERPRISE ) **DEMAND FOR JURY TRIAL**
TITLE PARTNERS OF NEW TAMPA, LTD., ) **ALL COUNTS**
ENTERPRISE TITLE PARTNERS OF NEW )
TAMPA, LTD, JEWEL ELY, AND COLDWELL )
BANKER NEXT GENERATION REALTY OF )
CITRUS, LLC, D/B/A COLDWELL BANKER )
NEXT GENERATION REALTY, )
)
       Defendants. )
_____ )

## **COMPLAINT**

      Plaintiff, William Jakob ("Jakob")*,* by and through his undersigned counsel, hereby files his Complaint against Defendants, JPMorgan Chase Bank, National Association *("Chase Bank"),* Exceeding Grace Enterprises, LLC.,  Enterprise Title of Tampa Bay, Inc.*,*  Enterprise Title Affiliates, Inc., as General Partner of Enterprise Title Partners of New Tampa, LTD,  Enterprise Title Partners of  New Tampa, Ltd., (collectively "Enterprise Title Group") *,* Jewel Ely (*"Ely"),* and Coldwell Banker Next Generation Realty of Citrus, LLC, d/b/a Coldwell Banker Next Generation Realty ("Coldwell Banker"), and in support thereof state as follows:

## **GENERAL ALLEGATIONS – CHASE BANK**

      1.     That on or about November 8, 2021, the plaintiff had an account with the defendant, Chase, and was in the process of purchasing real property in the state of Florida (the "Florida Property").

2.      That November 8, 2021, a Monday, plaintiff went to his local Chase Bank Branch for the purpose of wiring the cash to close on the Florida Property to the title company.  Prior to initiating the wire transfer he questioned the bank manager as to why the account information for the wire showed that the wire was being directed to a New York account when the intended recipient was a title company located in Florida.  He was assured by the bank manager that it was common for title companies to have out-of-state accounts in the New York area and was further assured that it was a good account. Immediately following those assurances, a request for the wire transfer in the amount of $336,247.82 was initiated from the branch by the branch manager and transmitted to its wire department at approximately 4:26 p.m.  On information and belief, the Chase cutoff time for transmitting a same day wire had expired and accordingly the wire was not processed until the following business day. Chase subsequently confirmed that the wire transfer request was docketed with their wire transfer department for November 9.

3.      That within minutes after the initiation of the request for wire transfer made on November 8, plaintiff learned through a telephone conversation with the title company that the title company had not sent him wire instructions. Suspecting fraud, Plaintiff immediately returned to the bank branch, and with the assistance of the bank manager processed a wire recall dated November 8.  The wire recall was initiated at approximately 5:05 p.m – minutes after the request was made for the wire transfer.

4.      That on November 10, 2023, plaintiff received a secure email from Chase stating that Chase had received the wire recall which had been initiated by the bank manager on November 8, 2021. Plaintiff was given a secure case number and advised to follow up for the case update in 3-5 business days.

5.      That Defendant, Chase Bank, after being directed by Plaintiff's bank manager to recall the wire, within minutes of the origination of the wire transfer request, failed to process or

failed to timely process the recall of the wire, thereby allowing plaintiff's cash to close to be wired to another Chase account established by a fraudster account holder.

6.     That as a result of the failure to recall the wire, Chase transmitted $336,247.82 from Plaintiff's account to the account established by Chase and its fraudster account holder.

7.     That as of November 8, 2021, Chase Bank had been made aware of the fraudulent activity, that the funds from the wire were improperly obtained by its fraudster account holder, and that the funds then remained in Chase Bank's possession, control, and custody.

8.     That as of November 9, 2021, Chase Bank was made aware that funds in its possession were obtained or would be obtained as a result of illicit and illegal activity and knowingly failed to act to reverse the transaction or freeze the subject account to ensure the funds could not be withdrawn by the third-party fraudster.

9.     That Chase Bank failed to protect the plaintiff's funds and failed to freeze or otherwise restrict its fraudster account holder's withdrawal of the fraudulently obtained funds notwithstanding Chase Bank's knowledge of the fraudulent activity, the presence of the wired funds in its possession and the ability to freeze the fraudulent account to prevent further fraud or otherwise take remedial measures, including a freeze of the fraudulent account.

10.     That upon information and belief, Chase Bank failed to ensure its fraudster account holder's account was opened for a legitimate purpose and otherwise failed to verify the account was not being used for illegal or illicit activities.

11.     That upon information and belief, Chase Bank failed to act with reasonable care in accepting the wired funds it knew or should have known were fraudulently obtained based on its fraudster account holder's prior history and use, if any, inclusive of any prior fraud alerts or other illicit activities associated with the fraudulent account.

12.     Plaintiffs, reserve the right to supplement the allegations contained herein based on addition information that may be discovered concerning the Defendants' actions and any additional causes of action related thereto.

### GENERAL ALLEGATIONS – EXCEEDING GRACE ENTERPRISES

13.     Defendant, Exceeding Grace Enterprises, LLC, is a limited liability company organized and existing pursuant to the laws of the State of California.

14.     That on or about November 8, 2021, the plaintiff had an account with the defendant, Chase, and was in the process of purchasing real property in the state of Florida (the "Florida Property").

15.     That on or about November 8, 2021, and at all relevant times mentioned herein, the plaintiff had United States Currency in an amount in excess of $336,247.82 in a Chase bank account ending in 0436.

16.     That while in the process of negotiating the Florida purchase, the defendant, Exceeding Grace, fraudulently, improperly and/or without authority masqueraded as an employee of Enterprise Title Partners of New Tampa, Ltd., the title company the plaintiff was using for the purchase of the Florida Property.

17.     That while in the process of negotiating the Florida purchase, Exceeding Grace, fraudulently, improperly and/or without authority masqueraded as an employee of Coldwell Banker Realty, a real estate company plaintiff was using to purchase the property.

18.     During the course of such deceptive acts, the defendant, Exceeding Grace, engaged in email exchanges with the plaintiff with the intent to divert money from plaintiff's Chase Bank account to the account of Exceeding Grace.

19.     During such deceptive acts, the defendant, Exceeding Grace, posed as the title agent and requested payment representing the balance to close title on the purchase of the Florida Property in the amount of $336,247.82 ("Wire Amount").

20.     Having no legal right or interest in the Closing Funds, the defendant, Exceeding Grace, forwarded an email to the plaintiff with the intent for plaintiff to materially rely upon said information, requesting the funds be sent by electronic wire transfer to defendant.

21.     As a result of such request, the plaintiff initiated a wire transfer from his Chase account in the amount of $336,247.82 to another account intended to be for the purposes of purchasing the Florida Property.

22.     Upon information and belief, the account receiving the above-mentioned Wire Amount is held by defendant, Exceeding Grace, and is also an account maintained by the Defendant, Chase.

## GENERAL ALLEGATIONS – ENTERPRISE TITLE GROUP

23.     That on November 8, 2021, and at all relevant times mentioned herein, Enterprise Title Partners of New Tampa, LTD, was acting as an agent for Commonwealth Land Title Insurance Company for the purpose of issuing a title insurance commitment to plaintiff in connection with his contract to purchase the Florida Property.

24.     That on November 8, 2021, and at all relevant times mentioned herein, Enterprise Title of Tampa Bay, Inc., and/or other members of the Enterprise Title Group, pursuant to a contract for purchase of the Florida Property by the plaintiff, was acting as an escrow agent and as a closing agent for the closing of the Plaintiff's contract to purchase the Florida Real Property.

25.     That on November 8, 2021, and at all relevant times mentioned herein, Defendant, Enterprise Title of Tampa Bay, Inc, and/or other members of the Enterprise Title Group, acting in their capacity as escrow agent and closing agent for plaintiff, through the use of unsecured emails

and/or other communications, permitted its email account to be hacked or its email information disclosed to an imposter, facilitating the creation and transmittal to plaintiff of fraudulent wire instructions by a third-party fraudster.

26.     That on November 8, 2021, fraudulent wire instructions, facilitated by Defendant Enterprise Title of Tampa Bay, Inc. and/or other members of the Enterprise Title Group were transmitted to plaintiff, who then not knowing that said wire instructions were fraudulent, initiated a wire transfer in the sum of $336,247.82 to a third-party fraudster.

## GENERAL ALLEGATIONS - REAL ESTATE AGENT JEWEL ELY

27.     That Jewel Ely, at all relevant times mentioned herein, was a real estate agent for Coldwell Banker, and on information and belief, acted as a Single Agent for the plaintiff buyer in the purchase of the Florida Property.  Pursuant to Sec. 475.278, *Fla. Stat*., Defendant Ely, owed a fiduciary duty to Plaintiff to exercise skill, care, and diligence in performing his duties on behalf of the Plaintiff.

28.     That Ely while acting in his capacity as the plaintiff's real estate agent, failed to exercise skill, care, and diligence in performing his duties on behalf of the Plaintiff through his use of unsecured emails and/or other communications, and by permitting his email account to be disclosed to or hacked by an unknown third party thereby facilitating the creation and the transmittal of fraudulent wire instructions which were then transmitted to plaintiff, who not knowing that said wire instructions were fraudulent, initiated a wire transfer in the sum of $336,247.82 to a third-party fraudster.

## GENERAL ALLEGATIONS – COLDWELL BANKER

29.     That Jewel Ely, at all relevant times mentioned herein, was a real estate agent for Coldwell Banker, and on information and belief, acted as a cooperating agent  for the plaintiff buyer in the purchase of the Florida Property.  Pursuant to Sec. 475.278, *Fla. Stat*., Ely, owed a

fiduciary duty to Plaintiff to exercise skill, care, and diligence in performing his duties on behalf of the Plaintiff.

30.     That Ely while acting in her capacity as a real estate agent for Coldwell Banker and while acting as the plaintiff's real estate agent, failed to exercise skill, care, and diligence in performing his duties on behalf of the Plaintiff through his use of unsecured emails and/or other communications, and by permitting his email account to be hacked by an unknown third party thereby facilitating the creation and the transmittal of fraudulent wire instructions which were then transmitted to plaintiff, who not knowing that said wire instructions were fraudulent, initiated a wire transfer in the sum of $336,247.82 to a third-party fraudster.

## PARTIES, JURISDICTION AND VENUE

31.     This is an action for damages with respect to each of the following counts in excess of Fifty Thousand Dollars ($50,000.00), exclusive of interest, costs and attorneys' fees.

32.     Plaintiff is a resident of New York who entered a contract to purchase residential real property in Citrus County, in the state of Florida.

33.     Defendant, Chase Bank is incorporated in Delaware, and has its principal place of business at 1111 Polaris Parkway, Columbus, OH 43240. Chase Bank is a commercial bank in the business of initiating and otherwise facilitating numerous banking transactions on behalf of its customers throughout the State of Florida and is authorized to do business throughout Florida. Chase bank maintains multiple locations throughout the state of Florida and maintains a registered agent in the State of Florida, care of CT Corporation System, at 1200 S. Pine Island Rd., Plantation, FL 33324.

34.     Defendant, Enterprise Title of Tampa Bay, Inc. is a Florida corporation and has its principal place of business at 5303 Technology Drive, Tampa, FL 33647.

35.     Defendant, Enterprise Title Affiliates, Inc. is a Florida corporation and has its principal place of business at 5303 Technology Drive, Tampa, FL 33647.

36.     Defendant, Enterprise Title Partners of New Tampa, LTD, is a Florida limited partnership and has its principal place of business at 5303 Technology Drive, Tampa, FL 33647.

37.     Defendant, Jewel Ely, is a licensed Florida real estate agent employed by Coldwell Banker Next Generation Realty, and has his principal place of business at 531 N. Citrus Avenue, Crystal River, FL 34428.

38.     Defendant, Coldwell Banker Next Generation Realty of Citrus, LLC, d/b/a Coldwell Banker Next Generation Realty, is a licensed Florida real estate broker, and has its principal place of business at 531 N. Citrus Avenue, Crystal River, FL 34428.

39.     Defendant, Exceeding Grace Enterprises, LLC, is a limited liability company organized and existing pursuant to the laws of the State of California, and an employee or agent of members of the Enterprise Title group of companies.

40.     Venue is proper in Citrus County pursuant to Fla. Stat. §§ 47.011 and 47.021 because certain of the defendants reside or are domiciled in Citrus County, FL, all of said defendants were conducting business in the state of Florida in connection with the causes of action alleged in this complaint, and because the cause of action accrued in this county.

## COUNT I - NEGLIGENCE
### (Against Chase Bank)

41.     Plaintiff, re-alleges and incorporates by reference paragraphs 1 through 22 of this, Complaint as if fully set forth herein.

42.     This is an action for negligence against Chase Bank.

43.     Prior to August 8, 2021, Chase Bank permitted its fraudster account holder to open a fraudulent account and failed to monitor such account activity to ensure such account was not

being used for illegal or illicit purposes—especially when said account was thereafter in receipt of fraudulently obtained funds wired from plaintiff's account.

44.    On or about August 8, 2021, and thereafter, Chase Bank permitted its fraudster account holder to use its account to improperly obtain possession of plaintiff's wire.

45.    On August 8, 2021, a branch manager of Chase Bank was made aware of the fraudulent transaction.

46.    On August 8, 2021, and before the request for wire transfer of plaintiff's funds had been processed by the Chase Bank Wire Department, the branch manager, on behalf of Chase Bank, and on behalf of the plaintiff, processed a request to the Chase Bank Wire Department for the recall of the wire – all while the monies remained in Chase Bank's possession, control, and custody.

47.    On August 9, 2021, either before the wire transfer of plaintiff's funds had occurred or no later than the same day, Chase Bank had logged in the wire recall request processed by its branch manager, and acknowledged the same to plaintiff.

48.    That notwithstanding the wire recall made by the Chase Bank branch manager which had been transmitted within minutes of the wire transfer request, Chase Bank failed to process or timely process the wire recall and thereby negligently allowed the wire transfer to occur transferring the plaintiff's funds to its fraudulent account holder.

49.    That, in addition to its failure to timely process and process the wire recall, Chase had the ability to ensure that the funds transferred to its fraudulent account holder were not depleted, disbursed, or otherwise removed from Chase Bank but failed to act with due care.

50.    That Chase Bank's conduct in failing to process or timely process the wire recall and in failing to ensure that the funds transferred to its fraudulent account holder were not depleted or

removed from Chase Bank fell below a reasonable standard of care and management directly resulting in harm to plaintiff and the loss of the plaintiff's wired funds.

51.     Such a failure to act was reasonably understood to create a foreseeable zone of danger, particularly of theft, that was avoidable, but for, Chase Bank's failure to process or timely process the wire recall and in to ensure that the funds transferred to its fraudulent account holder were not depleted or removed from Chase Bank's possession, custody or control.

52.     Chase Bank also assumed a special relationship with plaintiff by first, affirmatively assuring  plaintiff that the account to which he was wiring the funds was a good account – meaning the account of the title company, and second,  by indicating Chase would do everything within its power to preserve its fraudster account holder's Chase Bank account and the funds in it by timely effectuating a wire recall, but then failed act consistent with that duty—in taking no action to effect the wire recall or timely effect the wire recall, or to prevent the withdrawal of funds from the fraudulent account.

53.     Additionally, plaintiff was further harmed by Chase Bank's lack of care in the management and maintenance of its fraudster account holder's accounts by and through its failure to adequately ensure such account was opened for a legitimate purpose and was not being used to facilitate fraud, theft or misappropriation by using the Chase Bank account.

54.     Each of these breaches of the relevant standard of care owed by Chase Bank to plaintiff were individually, or altogether, the direct and proximate cause(s) of plaintiff's losses.

55.     Accordingly, plaintiff suffered damages in the amount of, at least, the improperly obtained funds totaling $336,247.82, along with interest, costs and legal fees incurred in bringing this action.

56.     Plaintiffs had to employ the undersigned counsel to bring this action and are obligated to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff. respectfully requests this Court enter judgment in its favor for $336.247.82 in damages, plus interest, costs, and fees.

## COUNT II — AIDING AND ABETTING FRAUD
### (Against Chase Bank)

57.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 22 and 43 through 56 of this Complaint as if fully set forth herein.

58.     This is an action against Chase Bank for aiding and abetting fraud.

59.     The fraudster account holder's account improperly received plaintiff's wired funds by creating or conspiring with others to create false and fraudulent wire instructions, and transmitting them or conspiring with others to transmit them to plaintiff and intending on the plaintiff to rely on the falsified wire instructions in order to divert the plaintiff's funds to the fraudster account holder

60.     On November 8, 2021, the fraudster account holder transmitted falsified wire instructions, or caused the falsified wire instructions to be transmitted by other unknown persons involved in the fraud, to the plaintiff, through the hacked or negligently disclosed email accounts of Jewel Ely and/or a member of Enterprise Title, using its account number but using Enterprise Title Partners of Tampa, LTD, or one of its members, as the beneficiary, for purposes of diverting the plaintiff's funds to the fraudster account holder.

61.     Plaintiff, not knowing that he had received falsified wire instructions, reasonably relied on the falsified instructions, and wired plaintiff's funds unknowingly to the fraudster to his detriment.

62.     Chase Bank had actual knowledge of the fraudulent transaction associated with plaintiff's wire on November 8, 2021, when plaintiff made its branch manager aware of the fraudulent transaction and requested that the branch manager recall the wire. Nonetheless, and

despite Chase Bank's representations that it would immediately recall the fraudulent wire to ensure the improperly wired funds were not withdrawn, Chase Bank assisted its fraudster account holder by failing to undertake any action or by failing to take timely action consistent with its representations and assurances.

63.     Plaintiff suffered damages in the amount of, at least, the improperly obtained funds totaling $336,247.82, interest, costs, and legal fees.

64.     Plaintiffs had to employ the undersigned counsel to bring this action and are obligated to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in its favor for $336,247.83, interest, costs, and legal fees.

## COUNT III — AIDING AND ABETTING CONVERSION
### (Against Chase Bank)

65.     Plaintiff re-alleges and incorporates by reference paragraphs 1 through 22 and paragraphs 43 through 64 of this Complaint as if fully set forth herein.

66.     This is an action against Chase Bank for aiding and abetting conversion.

67.     Chase Bank's fraudster account holder converted funds by wrongfully obtaining and retaining plaintiff's funds for personal use despite having no entitlement to the funds or otherwise being related to the Property transaction.

68.     Chase Bank's fraudster account holder did so by altering or conspiring with others involved in the fraud to alter wire instructions and transmitting them on November 8, 2021, to the plaintiff through the email accounts or spoofed email accounts of Jewel Ely and/or members of the Enterprise Title Group.

69.     Chase Bank had actual knowledge of the fraudulent transaction as early as November 8, 2021 when its branch manager was made expressly aware of the fraudulent

transaction, confirmed that the wired funds were in Chase Bank's possession, custody and control, and failed to timely recall the wire as directed by plaintiff.

70.     Despite Chase Bank's representation that it would undertake steps to immediately recall the wired funds to ensure they were not withdrawn, Chase Bank effectively rendered assistance to its fraudster account holder by failing to undertake any action to recall or timely recall the wire.

71.     On November 8, 2021, Chase Bank had actual knowledge about the improper use of the fraudster account holder's account and the improper receipt of the wired funds by that account's beneficiaries, but nonetheless failed to undertake any action to preserve the funds therein.

72.     Chase Bank's disregard for the subject fraudulent transaction, and its actual knowledge of the wrongdoing associated with the fraudster account holder's account rendered substantial assistance to the owners of that account in perpetrating the fraud.

73.     Plaintiff suffered damages in the amount of, at least, the improperly obtained funds totaling $326,589.15, interest, costs, and legal fees.

74.     Plaintiffs had to employ the undersigned counsel to bring this action and are obligated to pay them a reasonable fee for their services.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in its favor for $336,247.82, interest, costs and fees.

## COUNT IV – BREACH OF CONTRACT
### (Against Enterprise Title Group)

75.     This is an action for breach of contract brought jointly and severally against each of the members of the Enterprise Title Group, to wit, Enterprise Title of Tampa Bay Inc., Enterprise Title Affiliates, Inc. as General Partner of Enterprise Title Partners of New Tampa, LTD, and

Enterprise Title Partners of New Tampa, LTD., in its own capacity, (hereinafter collectively referred to as "Enterprise Title Group").

76.    On or about October 26, 2021, the plaintiff contracted to purchase residential property commonly known as 5971 S. Shadytree Path, Homosassa, Citrus County, FL 34448. A copy of the contract is attached hereto as Exhibit 1 (the "contract").

77.    The contract designated Enterprise Title Partners of New Tampa, LTD, and/or Enterprise Title Group as the escrow and closing agent.

78.    Enterprise Title Group accepted the offer to serve as escrow and closing agent. On information and belief, Enterprise Title of Tampa Bay Inc. performed the escrow duties for the Enterprise Title Group and Enterprise Title Partners of New Tampa, LTD, issued the title insurance commitment and acted in conjunction with Enterprise Title of Tampa Bay Inc. in processing the proposed closing of plaintiff's contract. With the acceptance of the offer to serve as the title issuing agent, and as the escrow and closing agent, for plaintiff's purchase, each of the members of the Enterprise Title Group, individually and jointly, impliedly agreed to process the closing in a manner that would protect the interests of the parties to the Exhibit 1 contract to collect and disburse the funds needed to close the transaction in a safe and prudent manner.

79.    Additionally, the each of the members of the Enterprise Title Group, impliedly promised to take all reasonable steps necessary to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the plaintiffs, including but not limited to the existence of the contract, the identities of the parties, the email addresses of the parties, the terms of the contract and proposed closing documents, and the dates and process for transmittal of funds required to close the purchase.

80.    In a section of the contract titled "Standards for Real Estate Transactions" the contract standards in connection with the transmittal of funds required by the contract provides:

> Collection or Collected means any checks tendered or received including deposits have become actually or finally collected and deposited in the account of the Escrow Agent or Closing Agent. The closing agent is authorized to delay the disbursement of funds and delivery of the closing documents until such amounts have been collected in Closing Agents accounts.

By its terms, the contract permitted the transmittal of funds required by the contract to made by check.   There is no requirement contained in the contract that funds be transmitted by wire. The request that funds be transmitted by wire transfer was for the administrative convenience of the title company.   On information and belief, the members of the Enterprise Title Group, never advised the plaintiff that he was authorized by the contract – which provides no standards or a requirement for transfers by wire - to transmit funds to Enterprise Title in the form of a check thereby eliminating the risk of loss which the Title Group knew or should have known was associated with and occurring in real estate transactions through the use of wire transfers.

81.     On October 29, 2021, Laura Bryan, a representative of the Enterprise Title Group, emailed to plaintiff via her email address lbryan@enterprisetitlegroup.com instructions for the escrow deposit.  The plaintiff was advised to wire the escrow and that the instructions to do so had been sent via ZIX encrypted email requiring a password to open.

82.     Between October 29, 2021 and November 8, 2021, numerous unencrypted and otherwise unsecure emails were transmitted to plaintiff by various persons employed by the Enterprise Title Group.  These unencrypted emails included emails from Kimberly Brennan, a closing processor for Enterprise Title Group to plaintiff and other third parties, from her email domain at kbrennan@enterprisetitlegroup.com together with emails to plaintiff and other third parties from or copied by others to Missy Waller, Senior Escrow Officer, to and from her email domain at mawaller@enterprisetitlegroups.com.

83.     By accepting the offer of the buyer and seller to serve as escrow and closing agent and being designated as such in the contract, each of the members of the Enterprise Title Group impliedly promised to process the transaction to avoid the risks of loss associated with the electronic transfer of funds by maintaining security controls and as part of their closing practice to prevent unauthorized third parties from gaining access to information pertaining to the closing.

84.     The email accounts of one or more employees of members of the Enterprise Title Group was breached by a third party allowing a third party fraudster to obtain information regarding the existence of the contract, the identities of the parties to the contract, the date of the closing, the email addresses of the parties, the email addresses of the employees of the members of the Enterprise Title Group,  proposed closing documents including the settlement statement, and the dates and methodology for transmittal of funds required to close the purchase.

85.     As a direct and proximate result of the breach of the email accounts of one more employees of the Enterprise Title Group, a third party fraudster obtained sufficient information from the email accounts of the Enterprise Title Group, to create fraudulent wire instructions which plaintiff believed were generated by the Enterprise Title Group, and upon which he relied thereby causing his funds for the cash required to close in the amount of $336,247.82 to be diverted to the account of the fraudster.

86.     Members of the Enterprise Title Group, jointly and severally breached their implied and actual contractual obligations to the plaintiff by:

        a.     Failing to protect their email accounts  from a disclosure to, or interception by, or  breach by a third party, allowing a third party fraudster to obtain information regarding the existence of the contract, the identities of the parties to the contract, the date of the closing, the email addresses of the parties, the email addresses of the employees of the members of the

Enterprise Title Group,  proposed closing documents including the settlement statement, and the dates and methodology for transmittal of funds required to close the purchase.

b.      Leading plaintiff to believe that closing funds must be transferred by a wire transfer when transmittal by a check was authorized by the contract and was safer means for the transfer of the funds.

87.    As a direct and proximate result of the breach or breaches described above, the plaintiff suffered damages in the amount of, at least, the loss of the diverted funds totaling $336,247.82, along with interest, costs and legal fees incurred in bringing this action.

88.     Plaintiffs had to employ the undersigned counsel to bring this action and are obligated to pay them a reasonable fee for their services.

WHEREFORE, the plaintiff demands judgment against each of the members of Enterprise Title Group, jointly and severally, in the sum of $336,247.82, along with interest, costs and legal fees incurred in bringing this action.

## COUNT V – NEGLIGENCE
### (Against Enterprise Title Group)

89.    This is an action for negligence brought jointly and severally against each of the members of the Enterprise Title Group, to wit, Enterprise Title of Tampa Bay Inc., Enterprise Title Affiliates, Inc. as General Partner of Enterprise Title Partners of New Tampa, LTD, and Enterprise Title Partners of New Tampa, LTD., in its own capacity, (hereinafter collectively referred to as "Enterprise Title Group").

90.    Plaintiff realleges paragraphs 76 through 87 as if fully set forth herein.

91.    The members of the Enterprise Title Group knew or should have known through bulletins and fraud alerts routinely provided by their title underwriter and other information widely disseminated in the title industry that risks associated with the transfer of closing funds by wire

17

transfers required a heighted duty in connection with security to secure their email communications and other communications regarding the plaintiff's information, including, but not limited to their contact information, their personal information, their banking information, their email address, their email communications, the details of the pending contract including the closing date and the cash required to close, the need to communicate all information with the plaintiff and third parties associated with the transaction by safe and secure means, the risk involved when requiring funds be transferred by wire, and security for all email addresses being used by employees of the members of Enterprise Title Group.

92.     The members of Enterprise Title Group, jointly and severally, breached their duty to plaintiff described in paragraph 90 and negligently processed the transaction for the plaintiff when they:

a.      Failed to implement, maintain, follow adequate security controls and/or other safeguards appropriate for an escrow and closing agent to deter an imposter from successfully obtaining email addresses and allowing an imposter to alter the same, even though such security control and safeguards are widely available; and

b.      Failing to follow their own security controls including the use of encrypted email; and

c.      Failing to protect from disclosure to an imposter, plaintiff's email information, contact information, personal information, banking information, the email addresses of others involved in the transaction, the details of the pending contract including the closing date and the cash required to close; and

d.      Failing to communicate all information with the plaintiff and third parties associated with the transaction by safe and secure means, knowing the risk involved when requiring funds be transferred by wire, and failing to provide or utilize security measures for all

18

email addresses email communications being used by employees of the members of Enterprise Title Group; and

  e. Directing Plaintiff to transmit closing funds by wire when such a direction was not a requirement of the contract, increased the risk of loss of plaintiff's funds, and was only for the administrative convenience of the Enterprise escrow agent; and

  f. Otherwise, failing to carry out the duties of a closing agent and escrow agent in a reasonable and prudent manner given the risk of loss of plaintiff's funds from a wire transfer.

93. As a direct and proximate result of the negligence of the members of the Enterprise Title Group, the plaintiff suffered damages in the sum of $336,247.82, along with interest, costs and legal fees incurred in bringing this action.


  WHEREFORE, the plaintiff demands judgment against each of the members of Enterprise Title Group, jointly and severally, in the sum of $336,247.82, along with interest, costs and legal fees incurred in bringing this action.

## COUNT VI – BREACH OF FIDUCIARY DUTY
### (Against Enterprise Title)

94. Plaintiff realleges paragraphs 75 through 92 as fully alleged herein.

95. The Enterprise Title Group members agreed to serve as escrow and closing agent for the parties to Exhibit 1 contract. Among its duties, the Enterprise Title Group members agreed to perform was to received deposits of the funds required from plaintiff to close the purchase and hold them in escrow pending closing.

96. The members of Enterprise Title Group, jointly and severally, breached their fiduciary duty to plaintiff described in paragraphs 75 through 93 and negligently processed the transaction for the plaintiff when they:

a.      Failed to implement, maintain, follow adequate security controls and/or other safeguards appropriate for an escrow and closing agent to deter an imposter from successfully obtaining email addresses and allowing an imposter to alter the same, even though such security control and safeguards are widely available; and

b.      Failing to follow their own security controls including the use of encrypted email; and

c.      Failing to protect from disclosure to an imposter, plaintiff's email information, contact information, personal information, banking information, the email addresses of others involved in the transaction, the details of the pending contract including the closing date and the cash required to close; and

d.      Failing to communicate all information with the plaintiff and third parties associated with the transaction by safe and secure means, knowing the risk involved when requiring funds be transferred by wire, and failing to provide or utilize security measures for all email addresses email communications being used by employees of the members of Enterprise Title Group; and

e.      Directing Plaintiff to transmit closing funds by wire when such a direction was not a requirement of the contract, increased the risk of loss of plaintiff's funds, and was only for the administrative convenience of the Enterprise escrow agent; and

f.      Otherwise, failing to carry out the duties of a closing agent and escrow agent in a reasonable and prudent manner given the risk of loss of plaintiff's funds from a wire transfer.

WHEREFORE, the plaintiff demands judgment against each of the members of Enterprise Title Group, jointly and severally, in the sum of $336,247.82, along with interest, costs and legal fees incurred in bringing this action.

20

## COUNT VII — BREACH OF FIDUCIARY DUTY
### (Against Real Estate Agent Jewel Ely)

97.     This is an action for breach of fiduciary duty against Jewel Ely.

98.     Defendant, Jewel Ely, at all relevant times mentioned herein, was a real estate agent for Coldwell Banker, and on information and belief, acted as a Single Agent for the plaintiff in the purchase of Florida real property. Pursuant to Sec. 475.278, *Fla. Stat.*, Ely, acting as a Single Agent owed a fiduciary duty to Plaintiff to exercise skill, care, and diligence in performing his duties on behalf of the Plaintiff.

99.     Defendant, Jewel Ely, while acting in his capacity as the plaintiff's real estate agent, failed to exercise skill, care, and diligence in performing his duties on behalf of the Plaintiff through his use of unsecured emails and/or other communications, and by permitting his email account to be hacked or accessed by an unknown third party, thereby facilitating the creation and the transmittal of fraudulent wire instructions obtained through his hacked or fraudulently accessed email account which were then transmitted to plaintiff, who not knowing that said wire instructions were fraudulent, then initiated a wire transfer in the sum of $336,247.82 to a third-party fraudster.

100.     Ely owed a duty to exercise reasonable skill, care and diligence in his representation of plaintiff, inclusive of all matters required for plaintiff's acquisition of the Florida real property.

101.     Ely, as a licensed trained real estate agent knew or should have known that fraudulent activity can and has occurred in real estate transactions through the use of unsecured emails and the transmittal through unsecured email accounts of wire instructions for the transmittal of closing funds, and Ely failed to either advise plaintiff of that known security risk or to abide by his duty of care owed to plaintiff in protecting plaintiff against a random third-party gaining access to information and communications pertaining to the plaintiff's transaction.

102.    Specifically, Ely directed e-mail communications to a random third-party, providing copies of plaintiff's closing documents related to the Property and wire instructions to be utilized in remitting payment for the cash to close associated with the Property.

103.    Ely's failure to ensure such communications, and the information therein, remained confidential fell below the standard of care owed to plaintiff, and was the proximate cause of his damages.

104.    Not only was Ely's conduct in permitting disclosure of plaintiff's information and documents pertaining to the closing of the purchase of the Florida property to a third party fraudster a precipitating factor of the fraudulent scheme, but it was both the direct and proximate cause of allowing doctored wire instructions to be transmitted to a fraudster ultimately resulting in the monies being improperly wired to a fraudster.

105.    As a result of Ely's actions and other inaction, Plaintiff suffered damages in the amount of, at least, the improperly obtained funds totaling $336,247.82, interest, costs and legal fees.

106.    Plaintiff had to employ the undersigned counsel to bring this action and are obligated to pay them a reasonable fee for their services.

WHEREFORE, plaintiff respectfully request this Court enter judgment in its favor for $336,247.82, interest, costs and fees.

### COUNT VIII — NEGLIGENCE
### (Against Real Estate Agent Jewel Ely)

107.    Plaintiff, re-alleges and incorporates by reference paragraphs 94 through 103 of this Complaint as if fully set forth herein.

108.    This is an action for negligence against Jewel Ely.

109.    Ely's negligent failure to ensure such communications, and the information therein, remained confidential fell below the duty and care owed to plaintiff, and was the proximate cause of his damages.

110.    Not only was Ely's negligent conduct in permitting disclosure of plaintiff's information and documents pertaining to the closing of the purchase of the Florida property to a third party fraudster a precipitating factor of the fraudulent scheme, but it was both the direct and proximate cause of allowing doctored wire instructions to be transmitted to a fraudster ultimately resulting in the monies being improperly wired to a fraudster.

111.    As a result of Ely's actions and other inaction, Plaintiff suffered damages in the amount of, at least, the improperly obtained funds totaling $336,247.82, interest, costs and legal fees.

112.    Plaintiff had to employ the undersigned counsel to bring this action and are obligated to pay them a reasonable fee for their services.

WHEREFORE, plaintiff respectfully request this Court enter judgment in its favor for $336,247.82, interest, costs and fees.

### COUNT IX — BREACH OF FIDUCIARY DUTY
### (Against Coldwell Banker)

113.    Plaintiff re-alleges and incorporates by reference paragraphs 94 through 107 of this Complaint as if fully set forth herein.

114.    Defendant, Ely was a licensed real estate agent employed by Coldwell Banker and acting as a single agent for the plaintiff in plaintiff's purchase of Florida real property.

115.    As a result of Ely's actions and other inaction, and as a result of his breach of his fiduciary duty as set forth in paragraphs 94 through 107, Plaintiff suffered damages in the amount of, at least, the improperly obtained funds totaling $336,247.82, interest, costs and legal fees.

WHEREFORE, plaintiff respectfully request this Court enter judgment in its favor for $336,247.82, interest, costs and fees.

### COUNT X – NEGLIGENCE
### (Against Coldwell Banker)

116.    Plaintiff re-alleges and incorporates by reference paragraphs 94 through 107 of this Complaint as if fully set forth herein.

117.    At all time relevant to this complaint Ely was a real estate agent acting on behalf of Coldwell Banker and on behalf of the plaintiff and was acting within the scope of his agency.

118.   As a result of Ely's negligent actions and other inaction, and as a result of his negligent breach of his fiduciary duty to plaintiff as set forth in paragraphs 94 through 107, Plaintiff suffered damages in the amount of, at least, the improperly obtained funds totaling $336,247.82, interest, costs and legal fees.

WHEREFORE, plaintiff respectfully request this Court enter judgment in its favor for $336,247.82, interest, costs and fees.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues so triable.

WALTERS LEVINE & DEGRAVE
240 S. Pineapple Ave., Suite 206
Sarasota, Florida  34236
Telephone No.:  (941) 364-8787
Fax No.:  (941) 361-3023
Attorneys for Plaintiff

_____
Joel W. Walters
Florida Bar No.:  604356
jwalters@walterslevine.com

# EXHIBIT 1

dotloop signature verification

## "AS IS" Residential Contract For Sale And Purchase
**THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR**

 FloridaRealtors®

1\* **PARTIES:** ............ Diane Barker ("Seller"),
2\* and William T Jakob ("Buyer"),
3  agree that Seller shall sell and Buyer shall buy the following described Real Property and Personal Property
4  (collectively "Property") pursuant to the terms and conditions of this AS IS Residential Contract For Sale And Purchase
5  and any riders and addenda ("Contract"):
6  **1. PROPERTY DESCRIPTION:**
7\*     (a) Street address, city, zip: 5971 S Shadytree Path, Homosassa, FL 34448
8\*     (b) Located in: Citrus County, Florida. Property Tax ID #:1144272
9\*     (c) Real Property: The legal description is SIESTA SHORES UNIT 2 PB 3 PG 50 LOT 20: EXC COM AT SW COR OF LOT 20, TH S 89
10     DEG 54M E AL S LN OF LOT 20 114.49 FT F ORPOB, TH N 45 DEG E 15 FT MOL TO
11
12     together with all existing improvements and fixtures, including built-in appliances, built-in furnishings and
13     attached wall-to-wall carpeting and flooring ("Real Property") unless specifically excluded in Paragraph 1(e) or
14     by other terms of this Contract.
15     (d) Personal Property: Unless excluded in Paragraph 1(e) or by other terms of this Contract, the following items
16     which are owned by Seller and existing on the Property as of the date of the initial offer are included in the
17     purchase: range(s)/oven(s), refrigerator(s), dishwasher(s), disposal, ceiling fan(s), intercom, light fixture(s),
18     drapery rods and draperies, blinds, window treatments, smoke detector(s), garage door opener(s), security gate
19     and other access devices, and storm shutters/panels ("Personal Property").
20\*     Other Personal Property items included in this purchase are:
21
22     Personal Property is included in the Purchase Price, has no contributory value, and shall be left for the Buyer.
23\*     (e) The following items are excluded from the purchase:
24

PURCHASE PRICE AND CLOSING

26\* **2. PURCHASE PRICE** (U.S. currency): ...................................................................$ 340000
27\*     (a) Initial deposit to be held in escrow in the amount of **(checks subject to COLLECTION)** ......$ 5000.00
28     The initial deposit made payable and delivered to "Escrow Agent" named below
29\*     **(CHECK ONE):** (i) ☐ accompanies offer or (ii) ☐ is to be made within _____ (if left
30     blank, then 3) days after Effective Date. IF NEITHER BOX IS CHECKED, THEN
31     OPTION (ii) SHALL BE DEEMED SELECTED.
32\*     Escrow Agent Information: Name: Missy Waller
33\*     Address: 5303 Technology Dr, Tampa, FL 33647
34\*     Phone: 813-961-3391 E-mail: pclark@enterprisetitlegroup.com Fax:
35\*     (b) Additional deposit to be delivered to Escrow Agent within _____ (if left blank, then 10)
36\*     days after Effective Date ............................................................................$
37     (All deposits paid or agreed to be paid, are collectively referred to as the "Deposit")
38\*     (c) Financing: Express as a dollar amount or percentage ("Loan Amount") see Paragraph 8.........
39\*     (d) Other: ......................................................$
40     (e) Balance to close (not including Buyer's closing costs, prepaids and prorations) by wire
41\*     transfer or other **COLLECTED** funds ..............................................$ 335,000.00
42     **NOTE: For the definition of "COLLECTION" or "COLLECTED" see STANDARD S.**
43 **3. TIME FOR ACCEPTANCE OF OFFER AND COUNTER-OFFERS; EFFECTIVE DATE:**
44\*     (a) If not signed by Buyer and Seller, and an executed copy delivered to all parties on or before
45\*     10/27/2021 , this offer shall be deemed withdrawn and the Deposit, if any, shall be returned to
46     Buyer. Unless otherwise stated, time for acceptance of any counter-offers shall be within 2 days after the day
47     the counter-offer is delivered.
48     (b) The effective date of this Contract shall be the date when the last one of the Buyer and Seller has signed or
49     initiated and delivered this offer or final counter-offer ("Effective Date").
50 **4. CLOSING DATE:** Unless modified by other provisions of this Contract, the closing of this transaction shall occur
51 and the closing documents required to be furnished by each party pursuant to this Contract shall be delivered
52\* ("Closing") on or before 11/19/2021 ("Closing Date"), at the time established by the Closing Agent.

Buyer's Initials [WJ] [ ]  Page 1 of 12  Seller's Initials [DB] [ ]

dotloop signature verification:

**5. EXTENSION OF CLOSING DATE:**
   (a) If Paragraph 8(b) is checked and Closing funds from Buyer's lender(s) are not available on Closing Date due to Consumer Financial Protection Bureau Closing Disclosure delivery requirements ("CFPB Requirements"), then Closing Date shall be extended for such period necessary to satisfy CFPB Requirements, provided such period shall not exceed 10 days.
   (b) If an event constituting "Force Majeure" causes services essential for Closing to be unavailable, including the unavailability of utilities or issuance of hazard, wind, flood or homeowners' insurance, Closing Date shall be extended as provided in STANDARD G.

**6. OCCUPANCY AND POSSESSION:**
   (a) Unless the box in Paragraph 6(b) is checked, Seller shall, at Closing, deliver occupancy and possession of the Property to Buyer free of tenants, occupants and future tenancies. Also, at Closing, Seller shall have removed all personal items and trash from the Property and shall deliver all keys, garage door openers, access devices and codes, as applicable, to Buyer. If occupancy is to be delivered before Closing, Buyer assumes all risks of loss to the Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted the Property in its existing condition as of time of taking occupancy.
   (b) ☐ **CHECK IF PROPERTY IS SUBJECT TO LEASE(S) OR OCCUPANCY AFTER CLOSING.** If Property is subject to a lease(s) after Closing or is intended to be rented or occupied by third parties beyond Closing, the facts and terms thereof shall be disclosed in writing by Seller to Buyer and copies of the written lease(s) shall be delivered to Buyer, all within 5 days after Effective Date. If Buyer determines, in Buyer's sole discretion, that the lease(s) or terms of occupancy are not acceptable to Buyer, Buyer may terminate this Contract by delivery of written notice of such election to Seller within 5 days after receipt of the above items from Seller, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Estoppel Letter(s) and Seller's affidavit shall be provided pursuant to STANDARD D. If Property is intended to be occupied by Seller after Closing, see Rider U. POST-CLOSING OCCUPANCY BY SELLER.

**7. ASSIGNABILITY: (CHECK ONE):** Buyer ☐ may assign and thereby be released from any further liability under this Contract; ☑ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

FINANCING

**8. FINANCING:**
   ☑ (a) Buyer will pay cash for the purchase of the Property at Closing. There is no financing contingency to Buyer's obligation to close. If Buyer obtains a loan for any part of the Purchase Price of the Property, Buyer acknowledges that any terms and conditions imposed by Buyer's lender(s) or by CFPB Requirements shall not affect or extend the Buyer's obligation to close or otherwise affect any terms or conditions of this Contract.
   ☐ (b) This Contract is contingent upon Buyer obtaining approval of a ☐ conventional ☐ FHA ☐ VA or ☐ other _____ (describe) loan within _____ (if left blank, then 30) days after Effective Date ("Loan Approval Period") for **(CHECK ONE):** ☐ fixed, ☐ adjustable, ☐ fixed or adjustable rate in the Loan Amount (See Paragraph 2(c)), at an initial interest rate not to exceed _____ % (if left blank, then prevailing rate based upon Buyer's creditworthiness), and for a term of _____ (if left blank, then 30) years ("Financing").
          (i) Buyer shall make mortgage loan application for the Financing within _____ (if left blank, then 5) days after Effective Date and use good faith and diligent effort to obtain approval of a loan meeting the Financing terms ("Loan Approval") and thereafter to close this Contract. Loan Approval which requires a condition related to the sale by Buyer of other property shall not be deemed Loan Approval for purposes of this subparagraph.

   Buyer's failure to use diligent effort to obtain Loan Approval during the Loan Approval Period shall be considered a default under the terms of this Contract. For purposes of this provision, "diligent effort" includes, but is not limited to, timely furnishing all documents and information and paying of all fees and charges requested by Buyer's mortgage broker and lender in connection with Buyer's mortgage loan application.

          (ii) Buyer shall keep Seller and Broker fully informed about the status of Buyer's mortgage loan application, Loan Approval, and loan processing and authorizes Buyer's mortgage broker, lender, and Closing Agent to disclose such status and progress, and release preliminary and finally executed closing disclosures and settlement statements, to Seller and Broker.
          (iii) Upon Buyer obtaining Loan Approval, Buyer shall promptly deliver written notice of such approval to Seller.
          (iv) If Buyer is unable to obtain Loan Approval after the exercise of diligent effort, then at any time prior to expiration of the Loan Approval Period, Buyer may provide written notice to Seller stating that Buyer has been unable to obtain Loan Approval and has elected to either:
             (1) waive Loan Approval, in which event this Contract will continue as if Loan Approval had been obtained; or
             (2) terminate this Contract.

Buyer's Initials [WJ] 10/25/21                   Page 2 of 12                   Seller's Initials [DB]

dotloop signature verification:

109 (v) If Buyer fails to timely deliver either notice provided in Paragraph 8(b)(iii) or (iv), above, to Seller prior to
110 expiration of the Loan Approval Period, then Loan Approval shall be deemed waived, in which event this Contract
111 will continue as if Loan Approval had been obtained, provided however, Seller may elect to terminate this Contract
112 by delivering written notice to Buyer within 3 days after expiration of the Loan Approval Period.

113 (vi) If this Contract is timely terminated as provided by Paragraph 8(b)(iv)(2) or (v), above, and Buyer is not in
114 default under the terms of this Contract, Buyer shall be refunded the Deposit thereby releasing Buyer and Seller
115 from all further obligations under this Contract.

116 (vii) If Loan Approval has been obtained, or deemed to have been obtained, as provided above, and Buyer
117 fails to close this Contract, then the Deposit shall be paid to Seller unless failure to close is due to: (1) Seller's
118 default or inability to satisfy other contingencies of this Contract; (2) Property related conditions of the Loan Approval
119 have not been met (except when such conditions are waived by other provisions of this Contract); or (3) appraisal
120 of the Property obtained by Buyer's lender is insufficient to meet terms of the Loan Approval, in which event(s) the
121 Buyer shall be refunded the Deposit, thereby releasing Buyer and Seller from all further obligations under this
122 Contract.

123* ☐ (c) Assumption of existing mortgage (see rider for terms).
124* ☐ (d) Purchase money note and mortgage to Seller (see riders; addenda; or special clauses for terms).

125 **CLOSING COSTS, FEES AND CHARGES**

126 **9.  CLOSING COSTS; TITLE INSURANCE; SURVEY; HOME WARRANTY; SPECIAL ASSESSMENTS:**
127 **(a) COSTS TO BE PAID BY SELLER:**
128 • Documentary stamp taxes and surtax on deed, if any · HOA/Condominium Association estoppel fees
129 • Owner's Policy and Charges (if Paragraph 9(c)(i) is checked) · Recording and other fees needed to cure title
130 • Title search charges (if Paragraph 9(c)(iii) is checked) · Seller's attorneys' fees
131* • Municipal lien search (if Paragraph 9(c)(i) or (iii) is checked) · Other: _____
132 If, prior to Closing, Seller is unable to meet the AS IS Maintenance Requirement as required by Paragraph 11
133 a sum equal to 125% of estimated costs to meet the AS IS Maintenance Requirement shall be escrowed at
134 Closing. If actual costs to meet the AS IS Maintenance Requirement exceed escrowed amount, Seller shall pay
135 such actual costs. Any unused portion of escrowed amount(s) shall be returned to Seller.

136 **(b) COSTS TO BE PAID BY BUYER:**
137 • Taxes and recording fees on notes and mortgages · Loan expenses
138 • Recording fees for deed and financing statements · Appraisal fees
139 • Owner's Policy and Charges (if Paragraph 9(c)(ii) is checked) · Buyer's Inspections
140 • Survey (and elevation certification, if required) · Buyer's attorneys' fees
141 • Lender's title policy and endorsements · All property related insurance
142 • HOA/Condominium Association application/transfer fees · Owner's Policy Premium (if Paragraph
143 • Municipal lien search (if Paragraph 9(c)(ii) is checked) 9 (c)(iii) is checked.)
144* • Other: _____

145* **(c) TITLE EVIDENCE AND INSURANCE: At least _____ (if left blank, then 15, or if Paragraph 8(a) is checked,
146 then 5) days prior to Closing Date ("Title Evidence Deadline"), a title insurance commitment issued by a Florida
147 licensed title insurer, with legible copies of instruments listed as exceptions attached thereto ("Title
148 Commitment") and, after Closing, an owner's policy of title insurance (see STANDARD A for terms) shall be
149 obtained and delivered to Buyer. If Seller has an owner's policy of title insurance covering the Real Property, a
150 copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date. The owner's title policy
151 premium, title search and closing services (collectively, "Owner's Policy and Charges") shall be paid, as set
152 forth below. The title insurance premium charges for the owner's policy and any lender's policy will be calculated
153 and allocated in accordance with Florida law, but may be reported differently on certain federally mandated
154 closing disclosures and other closing documents.  For purposes of this Contract "municipal lien search" means a
155 search of records necessary for the owner's policy of title insurance to be issued without exception for unrecorded
156 liens imposed pursuant to Chapters 159 or 170, F.S., in favor of any governmental body, authority or agency.**
157 **(CHECK ONE):**
158* ☑ **(i) Seller shall designate Closing Agent and pay for Owner's Policy and Charges, and Buyer shall pay the
159 premium for Buyer's lender's policy and charges for closing services related to the lender's policy,
160 endorsements and loan closing, which amounts shall be paid by Buyer to Closing Agent or such other
161 provider(s) as Buyer may select; or**
162* ☐ **(ii) Buyer shall designate Closing Agent and pay for Owner's Policy and Charges and charges for closing
163 services related to Buyer's lender's policy, endorsements and loan closing; or**

dotloop signature verification:

164    ☐ (iii) **[MIAMI-DADE/BROWARD REGIONAL PROVISION]:** Seller shall furnish a copy of a prior owner's policy
165    of title insurance or other evidence of title and pay fees for: (A) a continuation or update of such title evidence,
166    which is acceptable to Buyer's title insurance underwriter for reissue of coverage; (B) tax search; and (C)
167    municipal lien search. Buyer shall obtain and pay for post-Closing continuation and premium for Buyer's owner's
168    policy, and if applicable, Buyer's lender's policy. Seller shall not be obligated to pay more than $_____
169    (if left blank, then $200.00) for abstract continuation or title search ordered or performed by Closing Agent.
170    (d) **SURVEY:** On or before Title Evidence Deadline, Buyer may, at Buyer's expense, have the Real Property
171    surveyed and certified by a registered Florida surveyor ("Survey"). If Seller has a survey covering the Real
172    Property, a copy shall be furnished to Buyer and Closing Agent within 5 days after Effective Date.
173    (e) **HOME WARRANTY:** At Closing, ☐ Buyer ☐ Seller ☐ N/A shall pay for a home warranty plan issued by
174    _____ at a cost not to exceed $_____. A home
175    warranty plan provides for repair or replacement of many of a home's mechanical systems and major built-in
176    appliances in the event of breakdown due to normal wear and tear during the agreement's warranty period.
177    (f) **SPECIAL ASSESSMENTS:** At Closing, Seller shall pay: (i) the full amount of liens imposed by a public body
178    ("public body" does not include a Condominium or Homeowner's Association) that are certified, confirmed and
179    ratified before Closing; and (ii) the amount of the public body's most recent estimate or assessment for an
180    improvement which is substantially complete as of Effective Date, but that has not resulted in a lien being
181    imposed on the Property before Closing. Buyer shall pay all other assessments. If special assessments may
182    be paid in installments **(CHECK ONE):**
183    ☐ (a) Seller shall pay installments due prior to Closing and Buyer shall pay installments due after Closing.
184    Installments prepaid or due for the year of Closing shall be prorated.
185    ☐ (b) Seller shall pay the assessment(s) in full prior to or at the time of Closing.
186    IF NEITHER BOX IS CHECKED, THEN OPTION (a) SHALL BE DEEMED SELECTED.
187    This Paragraph 9(f) shall not apply to a special benefit tax lien imposed by a community development district
188    (CDD) pursuant to Chapter 190, F.S., which lien shall be prorated pursuant to STANDARD K.

189    **DISCLOSURES**

190 **10. DISCLOSURES:**
191    (a) **RADON GAS:** Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in
192    sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that
193    exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding
194    radon and radon testing may be obtained from your county health department.
195    (b) **PERMITS DISCLOSURE:** Except as may have been disclosed by Seller to Buyer in a written disclosure, Seller
196    does not know of any improvements made to the Property which were made without required permits or made
197    pursuant to permits which have not been properly closed. If Seller identifies permits which have not been
198    properly closed or improvements which were not permitted, then Seller shall promptly deliver to Buyer all plans,
199    written documentation or other information in Seller's possession, knowledge, or control relating to
200    improvements to the Property which are the subject of such open permits or unpermitted improvements.
201    (c) **MOLD:** Mold is naturally occurring and may cause health risks or damage to property. If Buyer is concerned or
202    desires additional information regarding mold, Buyer should contact an appropriate professional.
203    (d) **FLOOD ZONE; ELEVATION CERTIFICATION:** Buyer is advised to verify by elevation certificate which flood
204    zone the Property is in, whether flood insurance is required by Buyer's lender, and what restrictions apply to
205    improving the Property and rebuilding in the event of casualty. If Property is in a "Special Flood Hazard Area"
206    or "Coastal Barrier Resources Act" designated area or otherwise protected area identified by the U.S. Fish and
207    Wildlife Service under the Coastal Barrier Resources Act and the lowest floor elevation for the building(s) and/or
208    flood insurance rating purposes is below minimum flood elevation or is ineligible for flood insurance coverage
209    through the National Flood Insurance Program or private flood insurance as defined in 42 U.S.C. §4012a, Buyer
210    may terminate this Contract by delivering written notice to Seller within _____ (if left blank, then 20) days after
211    Effective Date, and Buyer shall be refunded the Deposit thereby releasing Buyer and Seller from all further
212    obligations under this Contract, failing which Buyer accepts existing elevation of buildings and flood zone
213    designation of Property. The National Flood Insurance Program may assess additional fees or adjust premiums
214    for pre-Flood Insurance Rate Map (pre-FIRM) non-primary structures (residential structures in which the insured
215    or spouse does not reside for at least 50% of the year) and an elevation certificate may be required for actuarial
216    rating.
217    (e) **ENERGY BROCHURE:** Buyer acknowledges receipt of Florida Energy-Efficiency Rating Information Brochure
218    required by Section 553.996, F.S.

dotloop signature verification

(f) **LEAD-BASED PAINT:** If Property includes pre-1978 residential housing, a lead-based paint disclosure is mandatory.

(g) **HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE: BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION/COMMUNITY DISCLOSURE, IF APPLICABLE.**

(h) **PROPERTY TAX DISCLOSURE SUMMARY:** BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

(i) **FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT ("FIRPTA"):** Seller shall inform Buyer in writing if Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act ("FIRPTA"). Buyer and Seller shall comply with FIRPTA, which may require Seller to provide additional cash at Closing. If Seller is not a "foreign person", Seller can provide Buyer, at or prior to Closing, a certification of non-foreign status, under penalties of perjury, to inform Buyer and Closing Agent that no withholding is required. See STANDARD V for further information pertaining to FIRPTA. Buyer and Seller are advised to seek legal counsel and tax advice regarding their respective rights, obligations, reporting and withholding requirements pursuant to FIRPTA.

(j) **SELLER DISCLOSURE:** Seller knows of no facts materially affecting the value of the Real Property which are not readily observable and which have not been disclosed to Buyer. Except as provided for in the preceding sentence, Seller extends and intends no warranty and makes no representation of any type, either express or implied, as to the physical condition or history of the Property. Except as otherwise disclosed in writing Seller has received no written or verbal notice from any governmental entity or agency as to a currently uncorrected building, environmental or safety code violation.

PROPERTY MAINTENANCE, CONDITION, INSPECTIONS AND EXAMINATIONS

**11. PROPERTY MAINTENANCE:** Except for ordinary wear and tear and Casualty Loss, Seller shall maintain the Property, including, but not limited to, lawn, shrubbery, and pool, in the condition existing as of Effective Date ("AS IS Maintenance Requirement").

**12. PROPERTY INSPECTION; RIGHT TO CANCEL:**

(a) *PROPERTY INSPECTIONS AND RIGHT TO CANCEL: Buyer shall have* 10_____ *(if left blank, then 15) days after Effective Date ("Inspection Period") within which to have such inspections of the Property performed as Buyer shall desire during the Inspection Period. If Buyer determines, in Buyer's sole discretion, that the Property is not acceptable to Buyer, Buyer may terminate this Contract by delivering written notice of such election to Seller prior to expiration of Inspection Period. If Buyer timely terminates this Contract, the Deposit paid shall be returned to Buyer, thereupon, Buyer and Seller shall be released of all further obligations under this Contract; however, Buyer shall be responsible for prompt payment for such inspections, for repair of damage to, and restoration of, the Property resulting from such inspections, and shall provide Seller with paid receipts for all work done on the Property (the preceding provision shall survive termination of this Contract). Unless Buyer exercises the right to terminate granted herein, Buyer accepts the physical condition of the Property and any violation of governmental, building, environmental, and safety codes, restrictions, or requirements, but subject to Seller's continuing AS IS Maintenance Requirement, and Buyer shall be responsible for any and all repairs and improvements required by Buyer's lender.*

(b) WALK-THROUGH INSPECTION/RE-INSPECTION: On the day prior to Closing Date, or on Closing Date prior to time of Closing, as specified by Buyer, Buyer or Buyer's representative may perform a walk-through (and follow-up walk-through, if necessary) inspection of the Property solely to confirm that all items of Personal Property are on the Property and to verify that Seller has maintained the Property as required by the AS IS Maintenance Requirement and has met all other contractual obligations.

(c) SELLER ASSISTANCE AND COOPERATION IN CLOSE-OUT OF BUILDING PERMITS: If Buyer's inspection of the Property identifies open or needed building permits, then Seller shall promptly deliver to Buyer all plans, written documentation or other information in Seller's possession, knowledge, or control relating to improvements to the Property which are the subject of such open or needed Permits, and shall promptly cooperate in good faith with Buyer's efforts to obtain estimates of repairs or other work necessary to resolve such Permit issues. Seller's obligation to cooperate shall include Seller's execution of necessary authorizations,

dotloop signature verification:

274 consents, or other documents necessary for Buyer to conduct inspections and have estimates of such repairs
275 or work prepared, but in fulfilling such obligation, Seller shall not be required to expend, or become obligated to
276 expend, any money.
277 (d) **ASSIGNMENT OF REPAIR AND TREATMENT CONTRACTS AND WARRANTIES:** At Buyer's option and
278 cost, Seller will, at Closing, assign all assignable repair, treatment and maintenance contracts and warranties
279 to Buyer.

280 ## ESCROW AGENT AND BROKER

281 **13. ESCROW AGENT:** Any Closing Agent or Escrow Agent (collectively "Agent") receiving the Deposit, other funds
282 and other items is authorized, and agrees by acceptance of them, to deposit them promptly, hold same in escrow
283 within the State of Florida, and subject to **COLLECTION**, disburse them in accordance with terms and conditions
284 of this Contract. Failure of funds to become **COLLECTED** shall not excuse Buyer's performance. When conflicting
285 demands for the Deposit are received, or Agent has a good faith doubt as to entitlement to the Deposit, Agent may
286 take such actions permitted by this Paragraph 13, as Agent deems advisable. If in doubt as to Agent's duties or
287 liabilities under this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until
288 the parties agree to its disbursement or until a final judgment of a court of competent jurisdiction shall determine
289 the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the
290 dispute. An attorney who represents a party and also acts as Agent may represent such party in such action. Upon
291 notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the
292 extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will
293 comply with provisions of Chapter 475, F.S., as amended and FREC rules to timely resolve escrow disputes through
294 mediation, arbitration, interpleader or an escrow disbursement order.
295 In any proceeding between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder,
296 or in any proceeding where Agent interpleads the subject matter of the escrow, Agent shall recover reasonable
297 attorney's fees and costs incurred, to be paid pursuant to court order out of the escrowed funds or equivalent. Agent
298 shall not be liable to any party or person for mis-delivery of any escrowed items, unless such mis-delivery is due to
299 Agent's willful breach of this Contract or Agent's gross negligence. This Paragraph 13 shall survive Closing or
300 termination of this Contract.
301 **14. PROFESSIONAL ADVICE; BROKER LIABILITY:** Broker advises Buyer and Seller to verify Property condition,
302 square footage, and all other facts and representations made pursuant to this Contract and to consult appropriate
303 professionals for legal, tax, environmental, and other specialized advice concerning matters affecting the Property
304 and the transaction contemplated by this Contract. Broker represents to Buyer that Broker does not reside on the
305 Property and that all representations (oral, written or otherwise) by Broker are based on Seller representations or
306 public records. **BUYER AGREES TO RELY SOLELY ON SELLER, PROFESSIONAL INSPECTORS AND**
307 **GOVERNMENTAL AGENCIES FOR VERIFICATION OF PROPERTY CONDITION, SQUARE FOOTAGE AND**
308 **FACTS THAT MATERIALLY AFFECT PROPERTY VALUE AND NOT ON THE REPRESENTATIONS (ORAL,**
309 **WRITTEN OR OTHERWISE) OF BROKER.** Buyer and Seller (individually, the "Indemnifying Party") each
310 individually indemnifies, holds harmless, and releases Broker and Broker's officers, directors, agents and
311 employees from all liability for loss or damage, including all costs and expenses, and reasonable attorney's fees at
312 all levels, suffered or incurred by Broker and Broker's officers, directors, agents and employees in connection with
313 or arising from claims, demands or causes of action instituted by Buyer or Seller based on: (i) inaccuracy of
314 information provided by the Indemnifying Party or from public records; (ii) Indemnifying Party's misstatement(s) or
315 failure to perform contractual obligations; (iii) Broker's performance, at Indemnifying Party's request, of any task
316 beyond the scope of services regulated by Chapter 475, F.S., as amended, including Broker's referral,
317 recommendation or retention of any vendor for, or on behalf of, Indemnifying Party; (iv) products or services
318 provided by any such vendor for, or on behalf of, Indemnifying Party; and (v) expenses incurred by any such vendor.
319 Buyer and Seller each assumes full responsibility for selecting and compensating their respective vendors and
320 paying their other costs under this Contract whether or not this transaction closes. This Paragraph 14 will not relieve
321 Broker of statutory obligations under Chapter 475, F.S., as amended. For purposes of this Paragraph 14, Broker
322 will be treated as a party to this Contract. This Paragraph 14 shall survive Closing or termination of this Contract.

323 ## DEFAULT AND DISPUTE RESOLUTION

324 **15. DEFAULT:**
325 (a) **BUYER DEFAULT:** If Buyer fails, neglects or refuses to perform Buyer's obligations under this Contract,
326 including payment of the Deposit, within the time(s) specified, Seller may elect to recover and retain the Deposit
327 for the account of Seller as agreed upon liquidated damages, consideration for execution of this Contract, and
328 in full settlement of any claims, whereupon Buyer and Seller shall be relieved from all further obligations under

Buyer's Initials [WJ] [ ]      Page 6 of 12      Seller's Initials [RB] [ ]
10/25/21
FloridaRealtors/FloridaBar-ASIS-5x   Rev.6/19 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.
dotloop verified

dotloop signature verification:

329 this Contract, or Seller, at Seller's option, may, pursuant to Paragraph 16, proceed in equity to enforce Seller's
330 rights under this Contract. The portion of the Deposit, if any, paid to Listing Broker upon default by Buyer, shall
331 be split equally between Listing Broker and Cooperating Broker; provided however, Cooperating Broker's share
332 shall not be greater than the commission amount Listing Broker had agreed to pay to Cooperating Broker.
333 (b) **SELLER DEFAULT:** If for any reason other than failure of Seller to make Seller's title marketable after
334 reasonable diligent effort, Seller fails, neglects or refuses to perform Seller's obligations under this Contract,
335 Buyer may elect to receive return of Buyer's Deposit without thereby waiving any action for damages resulting
336 from Seller's breach, and, pursuant to Paragraph 16, may seek to recover such damages or seek specific
337 performance.
338 This Paragraph 15 shall survive Closing or termination of this Contract.
339 **16. DISPUTE RESOLUTION:** Unresolved controversies, claims and other matters in question between Buyer and
340 Seller arising out of, or relating to, this Contract or its breach, enforcement or interpretation ("Dispute") will be settled
341 as follows:
342 (a) Buyer and Seller will have 10 days after the date conflicting demands for the Deposit are made to attempt to
343 resolve such Dispute, failing which, Buyer and Seller shall submit such Dispute to mediation under Paragraph
344 16(b).
345 (b) Buyer and Seller shall attempt to settle Disputes in an amicable manner through mediation pursuant to Florida
346 Rules for Certified and Court-Appointed Mediators and Chapter 44, F.S., as amended (the "Mediation Rules").
347 The mediator must be certified or must have experience in the real estate industry. Injunctive relief may be
348 sought without first complying with this Paragraph 16(b). Disputes not settled pursuant to this Paragraph 16
349 may be resolved by instituting action in the appropriate court having jurisdiction of the matter. This Paragraph
350 16 shall survive Closing or termination of this Contract.
351 **17. ATTORNEY'S FEES; COSTS:** The parties will split equally any mediation fee incurred in any mediation permitted
352 by this Contract, and each party will pay their own costs, expenses and fees, including attorney's fees, incurred in
353 conducting the mediation. In any litigation permitted by this Contract, the prevailing party shall be entitled to recover
354 from the non-prevailing party costs and fees, including reasonable attorney's fees, incurred in conducting the
355 litigation. This Paragraph 17 shall survive Closing or termination of this Contract.

356 **STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS")**

357 **18. STANDARDS:**
358 **A. TITLE:**
359 (i) **TITLE EVIDENCE; RESTRICTIONS; EASEMENTS; LIMITATIONS:** Within the time period provided in
360 Paragraph 9(c), the Title Commitment, with legible copies of instruments listed as exceptions attached thereto, shall
361 be issued and delivered to Buyer. The Title Commitment shall set forth those matters to be discharged by Seller at
362 or before Closing and shall provide that, upon recording of the deed to Buyer, an owner's policy of title insurance
363 in the amount of the Purchase Price, shall be issued to Buyer insuring Buyer's marketable title to the Real Property,
364 subject only to the following matters: (a) comprehensive land use plans, zoning, and other land use restrictions,
365 prohibitions and requirements imposed by governmental authority; (b) restrictions and matters appearing on the
366 Plat or otherwise common to the subdivision; (c) outstanding oil, gas and mineral rights of record without right of
367 entry; (d) unplatted public utility easements of record (located contiguous to real property lines and not more than
368 10 feet in width as to rear or front lines and 7 1/2 feet in width as to side lines); (e) taxes for year of Closing and
369 subsequent years; and (f) assumed mortgages and purchase money mortgages, if any (if additional items, attach
370 addendum); provided, that, none prevent use of Property for **RESIDENTIAL PURPOSES.** If there exists at Closing
371 any violation of items identified in (b) – (f) above, then the same shall be deemed a title defect. Marketable title shall
372 be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance
373 with law.
374 (ii) **TITLE EXAMINATION:** Buyer shall have 5 days after receipt of Title Commitment to examine it and notify Seller
375 in writing specifying defect(s), if any, that render title unmarketable. If Seller provides Title Commitment and it is
376 delivered to Buyer less than 5 days prior to Closing Date, Buyer may extend Closing for up to 5 days after date of
377 receipt to examine same in accordance with this STANDARD A. Seller shall have 30 days ("Cure Period") after
378 receipt of Buyer's notice to take reasonable diligent efforts to remove defects. If Buyer fails to notify Seller, Buyer
379 shall be deemed to have accepted title as it then is. If Seller cures defects within Cure Period, Seller will deliver
380 written notice to Buyer (with proof of cure acceptable to Buyer and Buyer's attorney) and the parties will close this
381 Contract on Closing Date (or if Closing Date has passed, within 10 days after Buyer's receipt of Seller's notice). If
382 Seller is unable to cure defects within Cure Period, then Buyer may, within 5 days after expiration of Cure Period,

dotloop signature verification

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

383 deliver written notice to Seller: (a) extending Cure Period for a specified period not to exceed 120 days within which
384 Seller shall continue to use reasonable diligent effort to remove or cure the defects ("Extended Cure Period"); or
385 (b) electing to accept title with existing defects and close this Contract on Closing Date (or if Closing Date has
386 passed, within the earlier of 10 days after end of Extended Cure Period or Buyer's receipt of Seller's notice), or (c)
387 electing to terminate this Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all
388 further obligations under this Contract. If after reasonable diligent effort, Seller is unable to timely cure defects, and
389 Buyer does not waive the defects, this Contract shall terminate, and Buyer shall receive a refund of the Deposit,
390 thereby releasing Buyer and Seller from all further obligations under this Contract.
391 **B. SURVEY:** If Survey discloses encroachments on the Real Property or that improvements located thereon
392 encroach on setback lines, easements, or lands of others, or violate any restrictions, covenants, or applicable
393 governmental regulations described in STANDARD A (i)(a), (b) or (d) above, Buyer shall deliver written notice of
394 such matters, together with a copy of Survey, to Seller within 5 days after Buyer's receipt of Survey, but no later
395 than Closing. If Buyer timely delivers such notice and Survey to Seller, such matters identified in the notice and
396 Survey shall constitute a title defect, subject to cure obligations of STANDARD A above. If Seller has delivered a
397 prior survey, Seller shall, at Buyer's request, execute an affidavit of "no change" to the Real Property since the
398 preparation of such prior survey, to the extent the affirmations therein are true and correct.
399 **C. INGRESS AND EGRESS:** Seller represents that there is ingress and egress to the Real Property and title to
400 the Real Property is insurable in accordance with STANDARD A without exception for lack of legal right of access.
401 **D. LEASE INFORMATION:** Seller shall, at least 10 days prior to Closing, furnish to Buyer estoppel letters from
402 tenant(s)/occupant(s) specifying nature and duration of occupancy, rental rates, advanced rent and security
403 deposits paid by tenant(s) or occupant(s)("Estoppel Letter(s)"). If Seller is unable to obtain such Estoppel Letter(s)
404 the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit
405 and Buyer may thereafter contact tenant(s) or occupant(s) to confirm such information. If Estoppel Letter(s) or
406 Seller's affidavit, if any, differ materially from Seller's representations and lease(s) provided pursuant to Paragraph
407 6, or if tenant(s)/occupant(s) fail or refuse to confirm Seller's affidavit, Buyer may deliver written notice to Seller
408 within 5 days after receipt of such information, but no later than 5 days prior to Closing Date, terminating this
409 Contract and receive a refund of the Deposit, thereby releasing Buyer and Seller from all further obligations under
410 this Contract. Seller shall, at Closing, deliver and assign all leases to Buyer who shall assume Seller's obligations
411 thereunder.
412 **E. LIENS:** Seller shall furnish to Buyer at Closing an affidavit attesting (i) to the absence of any financing
413 statement, claims of lien or potential lienors known to Seller and (ii) that there have been no improvements or
414 repairs to the Real Property for 90 days immediately preceding Closing Date. If the Real Property has been
415 improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all
416 general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth
417 names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges
418 for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been
419 paid or will be paid at Closing.
420 **F. TIME:** Calendar days shall be used in computing time periods. **Time is of the essence in this Contract.** Other
421 than time for acceptance and Effective Date as set forth in Paragraph 3, any time periods provided for or dates
422 specified in this Contract, whether preprinted, handwritten, typewritten or inserted herein, which shall end or occur
423 on a Saturday, Sunday, or a national legal holiday (see 5 U.S.C. 6103) shall extend to 5:00 p.m. (where the Property
424 is located) of the next business day.
425 **G. FORCE MAJEURE:** Buyer or Seller shall not be required to perform any obligation under this Contract or be
426 liable to each other for damages so long as performance or non-performance of the obligation, or the availability of
427 services, insurance or required approvals essential to Closing, is disrupted, delayed, caused or prevented by Force
428 Majeure. "Force Majeure" means: hurricanes, floods, extreme weather, earthquakes, fire, or other acts of God,
429 unusual transportation delays, or wars, insurrections, or acts of terrorism, which, by exercise of reasonable diligent
430 effort, the non-performing party is unable in whole or in part to prevent or overcome. All time periods, including
431 Closing Date, will be extended a reasonable time up to 7 days after the Force Majeure no longer prevents
432 performance under this Contract, provided, however, if such Force Majeure continues to prevent performance under
433 this Contract more than 30 days beyond Closing Date, then either party may terminate this Contract by delivering
434 written notice to the other and the Deposit shall be refunded to Buyer, thereby releasing Buyer and Seller from all
435 further obligations under this Contract.
436 **H. CONVEYANCE:** Seller shall convey marketable title to the Real Property by statutory warranty, trustee's,
437 personal representative's, or guardian's deed, as appropriate to the status of Seller, subject only to matters
438 described in STANDARD A and those accepted by Buyer. Personal Property shall, at request of Buyer, be

dotloop signature verification

### STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

439 transferred by absolute bill of sale with warranty of title, subject only to such matters as may be provided for in this
440 Contract.
441 **I.   CLOSING LOCATION; DOCUMENTS; AND PROCEDURE:**
442 **(i)   LOCATION:** Closing will be conducted by the attorney or other closing agent ("Closing Agent") designated by
443 the party paying for the owner's policy of title insurance and will take place in the county where the Real Property
444 is located at the office of the Closing Agent, or at such other location agreed to by the parties. If there is no title
445 insurance, Seller will designate Closing Agent. Closing may be conducted by mail, overnight courier, or electronic
446 means.
447 **(ii)   CLOSING DOCUMENTS:** Seller shall at or prior to Closing, execute and deliver, as applicable, deed, bill of
448 sale, certificate(s) of title or other documents necessary to transfer title to the Property, construction lien affidavit(s),
449 owner's possession and no lien affidavit(s), and assignment(s) of leases. Seller shall provide Buyer with paid
450 receipts for all work done on the Property pursuant to this Contract. Buyer shall furnish and pay for, as applicable,
451 the survey, flood elevation certification, and documents required by Buyer's lender.
452 **(iii)   FinCEN GTO NOTICE.   If Closing Agent is required to comply with the U.S. Treasury Department's**
453 **Financial Crimes Enforcement Network ("FinCEN") Geographic Targeting Orders ("GTOs"), then Buyer**
454 **shall provide Closing Agent with the information related to Buyer and the transaction contemplated by this**
455 **Contract that is required to complete IRS Form 8300, and Buyer consents to Closing Agent's collection and**
456 **report of said information to IRS.**
457 **(iv) PROCEDURE:** The deed shall be recorded upon **COLLECTION** of all closing funds. If the Title Commitment
458 provides insurance against adverse matters pursuant to Section 627.7841, F.S., as amended, the escrow closing
459 procedure required by STANDARD J shall be waived, and Closing Agent shall, **subject to COLLECTION of all**
460 **closing funds,** disburse at Closing the brokerage fees to Broker and the net sale proceeds to Seller.
461 **J.   ESCROW CLOSING PROCEDURE:** If Title Commitment issued pursuant to Paragraph 9(c) does not provide
462 for insurance against adverse matters as permitted under Section 627.7841, F.S., as amended, the following
463 escrow and closing procedures shall apply: (1) all Closing proceeds shall be held in escrow by the Closing Agent
464 for a period of not more than 10 days after Closing; (2) if Seller's title is rendered unmarketable, through no fault of
465 Buyer, Buyer shall, within the 10 day period, notify Seller in writing of the defect and Seller shall have 30 days from
466 date of receipt of such notification to cure the defect; (3) if Seller fails to timely cure the defect, the Deposit and all
467 Closing funds paid by Buyer shall, within 5 days after written demand by Buyer, be refunded to Buyer and,
468 simultaneously with such repayment, Buyer shall return the Personal Property, vacate the Real Property and re-
469 convey the Property to Seller by special warranty deed and bill of sale; and (4) if Buyer fails to make timely demand
470 for refund of the Deposit, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect
471 except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale.
472 **K.   PRORATIONS; CREDITS:** The following recurring items will be made current (if applicable) and prorated as of
473 the day prior to Closing Date, or date of occupancy if occupancy occurs before Closing Date: real estate taxes
474 (including special benefit tax assessments imposed by a CDD), interest, bonds, association fees, insurance, rents
475 and other expenses of Property. Buyer shall have option of taking over existing policies of insurance, if assumable,
476 in which event premiums shall be prorated. Cash at Closing shall be increased or decreased as may be required
477 by prorations to be made through day prior to Closing. Advance rent and security deposits, if any, will be credited
478 to Buyer. Escrow deposits held by Seller's mortgagee will be paid to Seller. Taxes shall be prorated based on
479 current year's tax. If Closing occurs on a date when current year's millage is not fixed but current year's assessment
480 is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's
481 assessment is not available, then taxes will be prorated on prior year's tax. If there are completed improvements
482 on the Real Property by January 1st of year of Closing, which improvements were not in existence on January 1st
483 of prior year, then taxes shall be prorated based upon prior year's millage and at an equitable assessment to be
484 agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an
485 informal assessment taking into account available exemptions. In all cases, due allowance shall be made for the
486 maximum allowable discounts and applicable homestead and other exemptions.   A tax proration based on an
487 estimate shall, at either party's request, be readjusted upon receipt of current year's tax bill. This STANDARD K
488 shall survive Closing.
489 **L.   ACCESS TO PROPERTY TO CONDUCT APPRAISALS, INSPECTIONS, AND WALK-THROUGH:** Seller
490 shall, upon reasonable notice, provide utilities service and access to Property for appraisals and inspections,
491 including a walk-through (or follow-up walk-through if necessary) prior to Closing.
492 **M. RISK OF LOSS:** If, after Effective Date, but before Closing, Property is damaged by fire or other casualty
493 ("Casualty Loss") and cost of restoration (which shall include cost of pruning or removing damaged trees) does not
494 exceed 1.5% of Purchase Price, cost of restoration shall be an obligation of Seller and Closing shall proceed
495 pursuant to terms of this Contract. If restoration is not completed as of Closing, a sum equal to 125% of estimated

dotloop signature verification: dtlp.us/TjxD-cb33-3WlN

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

553 parties, to be subsequently disbursed in accordance with the Withholding Certificate issued by the IRS or remitted
554 directly to the IRS if the Seller's application is rejected or upon terms set forth in the escrow agreement.
555 (iv) In the event the net proceeds due Seller are not sufficient to meet the withholding requirement(s) in this
556 transaction, Seller shall deliver to Buyer, at Closing, the additional COLLECTED funds necessary to satisfy the
557 applicable requirement and thereafter Buyer shall timely remit said funds to the IRS or escrow the funds for
558 disbursement in accordance with the final determination of the IRS, as applicable.
559 (v) Upon remitting funds to the IRS pursuant to this STANDARD, Buyer shall provide Seller copies of IRS Forms
560 8288 and 8288-A, as filed.
561 **W. RESERVED**
562 **X. BUYER WAIVER OF CLAIMS:** *To the extent permitted by law, Buyer waives any claims against Seller*
563 *and against any real estate licensee involved in the negotiation of this Contract for any damage or defects*
564 *pertaining to the physical condition of the Property that may exist at Closing of this Contract and be*
565 *subsequently discovered by the Buyer or anyone claiming by, through, under or against the Buyer. This*
566 *provision does not relieve Seller's obligation to comply with Paragraph 10(j). This Standard X shall survive*
567 *Closing.*

568 ### ADDENDA AND ADDITIONAL TERMS

569 * **19. ADDENDA:** The following additional terms are included in the attached addenda or riders and incorporated into this
570 Contract (**Check if applicable**):

| | | |
|---|---|---|
| ☐ A. Condominium Rider | ☐ K. RESERVED | ☐ T. Pre-Closing Occupancy |
| ☐ B. Homeowners' Assn. | ☐ L. RESERVED | ☐ U. Post-Closing Occupancy |
| ☐ C. Seller Financing | ☐ M. Defective Drywall | ☐ V. Sale of Buyer's Property |
| ☐ D. Mortgage Assumption | ☐ N. Coastal Construction Control | ☐ W. Back-up Contract |
| ☐ E. FHA/VA Financing |     Line | ☐ X. Kick-out Clause |
| ☐ F. Appraisal Contingency | ☐ O. Insulation Disclosure | ☐ Y. Seller's Attorney Approval |
| ☐ G. Short Sale | ☐ P. Lead Paint Disclosure (Pre-1978) | ☐ Z. Buyer's Attorney Approval |
| ☐ H. Homeowners/Flood Ins. | ☐ Q. Housing for Older Persons | ☐ AA. Licensee Property Interest |
| ☐ I. RESERVED | ☐ R. Rezoning | ☐ BB. Binding Arbitration |
| ☐ J. Interest-Bearing Acct. | ☐ S. Lease Purchase/ Lease Option | ☐ CC. Miami-Dade County |
| | |     Special Taxing District |
| | |     Disclosure |
| | | ☐ Other: _____ |
| | | _____ |
| | | _____ |

571 * **20. ADDITIONAL TERMS:** _____
572 _____
573 _____
574 _____
575 _____
576 _____
577 _____
578 _____
579 _____
580 _____
581 _____
582 _____
583 _____
584 _____
585 _____
586 _____
587 _____

588 ### COUNTER-OFFER/REJECTION

589 * ☐ Seller counters Buyer's offer (to accept the counter-offer, Buyer must sign or initial the counter-offered terms and
590 deliver a copy of the acceptance to Seller).
591 * ☐ Seller rejects Buyer's offer.

dotloop signature verification: dtlp.us/7Jxc-a003-WvsM

## STANDARDS FOR REAL ESTATE TRANSACTIONS ("STANDARDS") CONTINUED

cost to complete restoration (not to exceed 1.5% of Purchase Price) will be escrowed at Closing. If actual cost of restoration exceeds escrowed amount, Seller shall pay such actual costs (but, not in excess of 1.5% of Purchase Price). Any unused portion of escrowed amount shall be returned to Seller. If cost of restoration exceeds 1.5% of Purchase Price, Buyer shall elect to either take Property "as is" together with the 1.5%, or receive a refund of the Deposit thereby releasing Buyer and Seller from all further obligations under this Contract. Seller's sole obligation with respect to tree damage by casualty or other natural occurrence shall be cost of pruning or removal.

**N.  1031 EXCHANGE:** If either Seller or Buyer wish to enter into a like-kind exchange (either simultaneously with Closing or deferred) under Section 1031 of the Internal Revenue Code ("Exchange"), the other party shall cooperate in all reasonable respects to effectuate the Exchange, including execution of documents; provided, however, cooperating party shall incur no liability or expense related to the Exchange, and Closing shall not be contingent upon, nor extended or delayed by, such Exchange.

**O.  CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE; DELIVERY; COPIES; CONTRACT EXECUTION:** Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall be binding on, and inure to the benefit of, the parties and their respective heirs or successors in interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice and delivery given by or to the attorney or broker (including such broker's real estate licensee) representing any party shall be as effective as if given by or to that party. All notices must be in writing and may be made by mail, personal delivery or electronic (including "pdf") media. A facsimile or electronic (including "pdf") copy of this Contract and any signatures hereon shall be considered for all purposes as an original. This Contract may be executed by use of electronic signatures, as determined by Florida's Electronic Signature Act and other applicable laws.

**P.  INTEGRATION; MODIFICATION:** This Contract contains the full and complete understanding and agreement of Buyer and Seller with respect to the transaction contemplated by this Contract and no prior agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No modification to or change in this Contract shall be valid or binding upon Buyer or Seller unless in writing and executed by the parties intended to be bound by it.

**Q.  WAIVER:** Failure of Buyer or Seller to insist on compliance with, or strict performance of, any provision of this Contract, or to take advantage of any right under this Contract, shall not constitute a waiver of other provisions or rights.

**R.  RIDERS; ADDENDA; TYPEWRITTEN OR HANDWRITTEN PROVISIONS:** Riders, addenda, and typewritten or handwritten provisions shall control all printed provisions of this Contract in conflict with them.

**S.  COLLECTION or COLLECTED: "COLLECTION" or "COLLECTED" means any checks tendered or received, including Deposits, have become actually and finally collected and deposited in the account of Escrow Agent or Closing Agent. Closing and disbursement of funds and delivery of closing documents may be delayed by Closing Agent until such amounts have been COLLECTED in Closing Agent's accounts.**

**T.  RESERVED.**

**U.  APPLICABLE LAW AND VENUE:** This Contract shall be construed in accordance with the laws of the State of Florida and venue for resolution of all disputes, whether by mediation, arbitration or litigation, shall lie in the county where the Real Property is located.

**V.  FIRPTA TAX WITHHOLDING:** If a seller of U.S. real property is a "foreign person" as defined by FIRPTA, Section 1445 of the Internal Revenue Code ("Code") requires the buyer of the real property to withhold up to 15% of the amount realized by the seller on the transfer and remit the withheld amount to the Internal Revenue Service (IRS) unless an exemption to the required withholding applies or the seller has obtained a Withholding Certificate from the IRS authorizing a reduced amount of withholding.

(i)  No withholding is required under Section 1445 of the Code if the Seller is not a "foreign person". Seller can provide proof of non-foreign status to Buyer by delivery of written certification signed under penalties of perjury, stating that Seller is not a foreign person and containing Seller's name, U.S. taxpayer identification number and home address (or office address, in the case of an entity), as provided for in 26 CFR 1.1445-2(b). Otherwise, Buyer shall withhold the applicable percentage of the amount realized by Seller on the transfer and timely remit said funds to the IRS.

(ii)  If Seller is a foreign person and has received a Withholding Certificate from the IRS which provides for reduced or eliminated withholding in this transaction and provides same to Buyer by Closing, then Buyer shall withhold the reduced sum required, if any, and timely remit said funds to the IRS.

(iii)  If prior to Closing Seller has submitted a completed application to the IRS for a Withholding Certificate and has provided to Buyer the notice required by 26 CFR 1.1445-1(c) (2)(i)(B) but no Withholding Certificate has been received as of Closing, Buyer shall, at Closing, withhold the applicable percentage of the amount realized by Seller on the transfer and, at Buyer's option, either (a) timely remit the withheld funds to the IRS or (b) place the funds in escrow, at Seller's expense, with an escrow agent selected by Buyer and pursuant to terms negotiated by the



dotloop signature verification:

592  THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE
593  ADVICE OF AN ATTORNEY PRIOR TO SIGNING.

594  THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR.

595  *Approval of this form by the Florida Realtors and The Florida Bar does not constitute an opinion that any of the*
596  *terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and*
597  *conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all*
598  *interested persons.*

599  AN ASTERISK (*) FOLLOWING A LINE NUMBER IN THE MARGIN INDICATES THE LINE CONTAINS A BLANK
600  TO BE COMPLETED.

601*  Buyer: *William Jakob*                              Date: _____

602*  Buyer: _____            Date: _____

603*  Seller: *Dianne Barber*                             Date: 10-06-21

604*  Seller: _____           Date: _____

605  Buyer's address for purposes of notice              Seller's address for purposes of notice
606*  17 Sun Ct, Riverhead, NY 11901                     _____
607*  _____               _____
608*  _____               _____

609  BROKER: Listing and Cooperating Brokers, if any, named below (collectively, "Broker"), are the only Brokers
610  entitled to compensation in connection with this Contract. Instruction to Closing Agent: Seller and Buyer direct
611  Closing Agent to disburse at Closing the full amount of the brokerage fees as specified in separate brokerage
612  agreements with the parties and cooperative agreements between the Brokers, except to the extent Broker has
613  retained such fees from the escrowed funds. This Contract shall not modify any MLS or other offer of compensation
614  made by Seller or Listing Broker to Cooperating Brokers.

615*  Jewel Ely                                           Christopher Bilar
616  **Cooperating Sales Associate, if any**             **Listing Sales Associate**

617*  Coldwell Banker Next Generation Realty              Florida Executive Realty
618  **Cooperating Broker, if any**                      **Listing Broker**

Buyer's Initials [WJ]  [  ]                Page 12 of 12                Seller's Initials [DB]  [  ]
FloridaRealtors/FloridaBar-ASIS-5x    Rev.6/19 © 2017 Florida Realtors® and The Florida Bar.  All rights reserved.

dotloop signature verification:

# Comprehensive Rider to the
# Residential Contract For Sale And Purchase
THIS FORM HAS BEEN APPROVED BY THE FLORIDA REALTORS AND THE FLORIDA BAR



Realtors

If initialed by all parties, the clauses below will be incorporated into the Florida Realtors®/Florida Bar Residential Contract For Sale And Purchase between ___Dianne Barker___ (SELLER) and___ (BUYER) concerning the Property described as ___5971 S. Shadytree Path Homosassa FL 34448___

**Buyer's Initials** [WB initials, dotloop verified 10/25/21]        **Seller's Initials** [DB]

## P. LEAD-BASED PAINT DISCLOSURE
### (Pre-1978 Housing)

#### Lead-Based Paint Warning Statement
"Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspection in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase."

**Seller's Disclosure (INITIAL)**

_____ (a) Presence of lead-based paint or lead-based paint hazards (CHECK ONE BELOW):
☐ Known lead-based paint or lead-based paint hazards are present in the housing.
☑ Seller has no knowledge of lead-based paint or lead-based paint hazards in the housing.

_[DB]_ (b) Records and reports available to the Seller (CHECK ONE BELOW):
☑ Seller has provided the Buyer with all available records and reports pertaining to lead-based paint or lead-based paint hazards in the housing. List documents: _____

☐ Seller has no reports or records pertaining to lead-based paint or lead-based paint hazards in the housing.

**Buyer's Acknowledgement (INITIAL)**

_____ (c) Buyer has received copies of all information listed above.

_____ (d) Buyer has received the pamphlet *Protect Your Family* from *Lead in Your Home*.

_____ (e) Buyer has (CHECK ONE BELOW):
☐ Received a 10-day opportunity (or other mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint or lead-based paint hazards; or
☐ Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint or lead-based paint hazards.

**Licensee's Acknowledgement (INITIAL)**

_____ (f) Licensee has informed the Seller of the Seller's obligations under 42 U.S.C. 4852(d) and is aware of Licensee's responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

| | | |
|---|---|---|
| _Dianne Barker_ | _9-16-2021_ | _William T Jakob_ [dotloop verified 10/25/21 11:41 AM EDT DWAO-1IAZ0-FSX1-4CDE] |
| SELLER | Date | BUYER    Date |
| SELLER | Date | _JEWELELY_ [dotloop verified 10/26/21 9:55 AM EDT IFJU-GG5J-8SWK-XX6C] |
| Listing Licensee _2-15-2021_ | Date | Selling Licensee    Date |

Any person or persons who knowingly violates the provisions of the Residential Lead-Based Paint Hazard Reduction Act of 1992 may be subject to civil and criminal penalties and potential triple damages in a private civil lawsuit.

CR-5x  Rev. 6/19  © 2015 Florida Realtors® and The Florida Bar.  All rights reserved.

This software is licensed to [Christopher Rilar - FLORIDA EXECUTIVE REALTY] www.transactiondesk.com.

Instanet

dotloop signature verification:

FLORIDA EXECUTIVE REALTY

## SELLER'S PROPERTY DISCLOSURE - RESIDENTIAL

**SELLER(S)**   Dianne Barker

**PROPERTY ADDRESS**   5971 S Shadytree Path Homosassa FL 34448

**Notice to Seller:** Florida law requires a **Seller** of real property to disclose to a **Buyer** all known facts that materially affect the value of the Property being sold and that are not readily observable or known by the **Buyer.** This disclosure form is designed to help you comply with the law. However, this disclosure form may not address every significant issue that is unique to the Property.  If you need more space for additional information, comments, or explanations, go to Paragraph 17 and explain.

**Notice to Buyer:** The following representations are made by the **Seller** and **not** by the real estate licensee(s). This disclosure is not a guaranty or warranty of any kind. It is not a substitute for any inspections, warranties, or professional advice you may wish to obtain. It is not a substitute for your own personal judgement and common sense.  The following information is based only upon **Seller's** actual knowledge of the Property's condition. **Sellers** can disclosure only what they actually know. **Seller** may not know about all material or latent defects. It is strongly recommended you have an independent professional home inspection to verify the condition of the Property and determine the cost of repairs, if any. This disclosure is not a contract and is not intended to be part of any contract for sale and purchase.

|                                                                        | YES | NO | NOT KNOWN |
|------------------------------------------------------------------------|-----|----|-----------|
| Is each individual seller a U.S. Citizen or resident alien?            | ☑   | ☐  | ☐         |

### 1. OCCUPANCY

|                                                                        | YES | NO | NOT KNOWN |
|------------------------------------------------------------------------|-----|----|-----------|
| **a.** Does Seller currently occupy this Property?                     | ☑   | ☐  | ☐         |
| **b.** How long has it been since the Seller occupied the Property? ___ |     |    |           |
| **c.** If vacant, since what month/year? ___                           |     |    |           |
| **d.** Does the Property currently have homestead exemption?           | ☐   | ☑  | ☐         |
| **e.** Do tenants currently occupy the Property?                       | ☐   | ☐  | ☐         |
| **f.** If YES, when does the lease expire? ___                         |     |    |           |

### 2. HOMEOWNER'S ASSOCIATION AND DEED RESTRICTIONS

|                                                                                                         | YES | NO | NOT KNOWN |
|---------------------------------------------------------------------------------------------------------|-----|----|-----------|
| **a.** Is the Property subject to any mandatory association(s) membership(s)?                            | ☐   | ☑  | ☐         |
| **b.** Are there any pending or proposed special assessments?                                           | ☐   | ☑  | ☐         |
| **c.** Is the Property currently in violation of any deed restrictions?                                 | ☐   | ☑  | ☐         |
| **d.** Are there any restrictions related to renting the Property?                                      | ☐   | ☑  | ☐         |
| **e.** Are you aware of any existing, pending and/or proposed legal actions, claims, or proposed changes in assessments and/or maintenance fees? | ☐   | ☑  | ☐         |
| **f.** Are you aware of any proposed changes to the Deed Restrictions?                                  | ☐   | ☑  | ☐         |
| **g.** If you answered YES to any of the above, please explain. ___                                     |     |    |           |
| **h.** Are the community roads private?                                                                 | ☐   | ☑  | ☐         |
| **i.** Is the direct ingress/egress to the property private?                                            | ☐   | ☑  | ☐         |
| **j.** If you answered YES to h. or i., is there a written maintenance agreement?                       | ☐   | ☐  | ☐         |

**SELLER** D.B. [dotloop verified 10252...]          1 of 7          **BUYER** ___
**Revised:** 04/2020

dotloop signature verification:

3. **LAND, SOIL, BOUNDARIES AND ZONING**                                      YES   NO   NOT KNOWN

   **a.** Do you know of any sliding, earth movement, upheaval or earth stability
   problems that have occurred on the Property or on adjacent properties?........ ☐  ☑  ☐
   **b.** Are you aware of any sinkholes on this Property or adjacent properties?....... ☐  ☑  ☐
   **c.** Do you know of any encroachments, boundary line disputes, or easements
   affecting the Property?.................................................................... ☐  ☑  ☐
   **d.** Are you aware of any condition or proposed change in the vicinity of the
   Property that does or will materially affect the value of the Property?........... ☐  ☑  ☐
   **e.** Do you have a copy of your survey?.................................................. ☐  ☑  ☐
   **f.** Do you have a copy of the elevation certificate for the Property?................ ☐  ☑  ☐
   **g.** Is the property zoned for its current use?.......................................... ☑  ☐  ☐
   **h.** Is the property in an Historic District?............................................... ☐  ☑  ☐
   **i.** Is the property in an Overlay District?................................................ ☐  ☑  ☐
   **j.** If you answered YES to any of the above, please explain._____

4. **ROOF AND ROOF-RELATED ITEMS**

   **a.** The age of the roof is? _____2013_____
   **b.** Is the roof structurally sound and free of leaks?.................................. ☑  ☐  ☐
   **c.** Has the roof leaked during your ownership?....................................... ☐  ☑  ☐
   **d.** Has there been work on the roof, gutters or fascia boards?..................... ☑  ☐  ☐
   **e.** Are you aware of any defects to the roof, soffits, fascia, flashing or other
   components of the roof system?....................................................... ☐  ☑  ☐
   **f.** Have you ever filed any insurance claim(s) regarding any of the above?....... ☐  ☑  ☐
   **g.** If you answered YES to any of the above, please explain. ____2013____

5. **TERMITE, OTHER WOOD-DESTROYING ORGANISMS (WDOs), PESTS**

   **a.** Do you have any knowledge of termites, dry-rot, fungi, or pests present on
   the Property or affecting the Property?.............................................. ☑  ☐  ☐
   **b.** Do you have any knowledge of any damage to the Property caused by wood
   destroying organisms, dry-rot and/or pests?........................................ ☐  ☑  ☐
   **c.** Is your Property currently under a termite warranty bond covered by a
   licensed pest control company?....................................................... ☑  ☐  ☐
   **d.** If yes, is the warranty transferable and is there a transfer fee?................. ☑  ☐  ☐
   **e.** If you answered YES to any of the above, please explain._____
   _____2014 treated for termites____
   _____WDO located on facia____

**SELLER**                        2 of 7                  **BUYER** _____
**Revised:** 04/2020

## INSPECTION/TREATMENT REPORT
### Please Refer to your Service Policy for Covered Pest(s)

2021 2021

PO Box 446 Crystal River FL 34423

(352)795-3614

**FLORIDA PEST CONTROL**
PO Box 446
Crystal River FL 34423
(352) 795-3614

Collect: ___ Full ___ 1/2 :
Paid in Full ___

SERVICE
POLICY B-011705   AUTHORIZED _____ B   ZONE    TT/TP/TG
MR MARK A BARKER                          11B       ☐
5971 S SHADYTREE PATH                              P/1   /UP
HOMOSASSA     FL CITRUS          OV16 IRT  10/12/94
   503-9158 HM        601-1021 CEL   RENEWAL FEE~   $109 00
DIRECTIONS & BUILDING:  NG NL NS NSC      Non-Taxable          INVOICE NO.
              FNDTN~ M     STR~                CS / CC
STILT HOME WIFE/DIANE   OLD HOMO END OF MASON CR    700893 5
THIS REPORT IS MADE ON THE BASIS OF WHAT WAS VISIBLE AND ACCESSIBLE AT THE TIME OF THE INSPECTION.
THIS REPORT IS NOT TO BE USED FOR REAL ESTATE TRANSACTIONS.

SERVICE
POLICY B-011705
MR MARK A BARKER
5971 S SHADYTREE PATH
HOMOSASSA FL CITRUS 34448-4924

Non-Taxable

| INVOICE NO. | DATE | T/R POLICY NO. |
|---|---|---|
| 700893 5 | 9/21/21 | 1705 |
| EMPLOYEE NO. | CASH CHARGE OTHER | RENEWAL FEE |
| 3609 | ✓ | $109 00 |

☐ ●   ☐ VISA   ☐ DISC VER   ☐

Card Number _____  Exp. Date _____

Please print name exactly as it appears on card

Signature X_____

**TECHNICIAN** David S   **TIME** 9 37

ADDRESS OF STRUCTURE:

5971 S SHADYTREE PATH
HOMOSASSA           FL CITRUS

1️⃣ LIVE COVERED PEST(S) FOUND: YES __  NO ✓ IF YES, DESCRIBE: _____

2️⃣ EVIDENCE OF COVERED PEST(S) FOUND: YES __  NO ✓  IF YES, DESCRIBE: _____

3️⃣ ALTHOUGH THESE PESTS ARE NOT COVERED BY THE SERVICE POLICY, AS A COURTESY, WE NOTED THE FOLLOWING:

4️⃣ TREATMENT MADE: YES __  NO ✓ IF YES, DESCRIBE: 2014

5️⃣ PRODUCT(S) APPLIED _____ TERMIDOR ____ PREMISE
ANY CHANGES, ADDITIONS, OR MODIFICATIONS NEEDED: YES __ NO ✓ INACCESSIBLE AREAS: YES __ NO ✓
DESCRIBE: _____

6️⃣ INSPECTIONS HAVE REPORTED EVIDENCE OF THE FOLLOWING:
SUBTERRANEAN TERMITES:   DRYWOOD TERMITES:   WOOD BORERS:   WOOD DECAYING FUNGI:

7️⃣ DAMAGE NOTED: _____
TECHNICIAN David S   DATE 9/21/21   TIME 9 39
IF YOU SUSPECT ANY PEST ACTIVITY, PLEASE CALL:

*Thank You*

PROTECT YOUR PROPERTY - RENEW YOUR
SERVICE POLICY

1/15 ©

dotloop signature verification:

|  |  | YES | NO | NOT KNOWN |
|---|---|---|---|---|
| **6. STRUCTURAL** | | | | |
| **a.** | Are you aware of any past or present movement, shifting, deterioration, or other construction problems with the foundation?.................................... | ☐ | ☑ | ☐ |
| **b.** | Have you ever filed an insurance or manufacturer's claim for defective or damaged materials?............................................................................. | ☐ | ☑ | ☐ |
| **c.** | Are structures including roof, ceilings, walls, doors, windows structurally sound?................................................................................................. | ☑ | ☐ | ☐ |
| **d.** | Are you aware of any past or present water leakage, accumulation, or dampness within the Property, basement or crawl space?......................... | ☑ | ☐ | ☐ |
| **e.** | Are you aware of any past or present problems with driveways, walkways, patios, retaining walls or seawalls?...................................................... | ☐ | ☑ | ☐ |
| **f.** | If you answered YES to any of the above, please explain._____ | | | | |

**7. ADDITIONS / REMODELS / IMPROVEMENTS**

|  |  | YES | NO | NOT KNOWN |
|---|---|---|---|---|
| **a.** | Have you made any improvements, additions, structural changes or other alterations to the Property?................................................................ | ☑ | ☐ | ☐ |
| **b.** | If YES, did you obtain all necessary permits and final approvals required from the HOA and/or governmental bodies? ………………………………... | ☑ | ☐ | ☐ |
| **c.** | Did any former owners of the Property make additions, structural changes or alterations to the Property?................................................................ | ☐ | ☐ | ☑ |
| **d.** | If you answered YES to any of the above, please explain._____ | | | | |

**8. MOISTURE / WATER INTRUSION / MOLD**

|  |  | YES | NO | NOT KNOWN |
|---|---|---|---|---|
| **a.** | Are you aware of any instances where moisture/water/condensation or humidity intruded into the structures located on the Property as the result of rain, flood, plumbing leak, appliance, roof, window, wall leak or any other type of leak event?........................................................................... | ☑ | ☐ | ☐ |
| **b.** | Are you aware of any clean up, repairs, or remediation of the Property including cleanup of mold because of moisture or water intrusion or condensation?............................................................................... | ☑ | ☐ | ☐ |
| **c.** | Are you aware of any other problem resulting from moisture/water intrusion/ condensation or humidity?................................................................. | ☐ | ☑ | ☐ |
| **d.** | Have you ever filed any insurance claims regarding any of the above?......... | ☐ | ☑ | ☐ |
| **e.** | If you answered YES to any of the above, please explain._____ *See additional information* | | | | |

SELLER D. B.   3 of 7   BUYER_____  _____

Revised: 04/2020

dotloop signature verification:

|  | YES | NO | NOT KNOWN |
|---|---|---|---|

### 9. ENVIRONMENT

**a.** Was the Property built before 1978?........................................ ☑ ☐ ☐

**b.** Are you aware of any substances, materials or products which may be an environmental hazard, such as but not limited to asbestos, radon gas, fuel urea formaldehyde, mold, lead-based paint, defective drywall, propane, or chemical storage tanks (active or abandoned), or contaminated soil or water on the Property?........................................................ ☐ ☑ ☐

**c.** Are any mangroves, archeological sites or other environmentally sensitive areas located on the Property?........................................ ☐ ☑ ☐

**d.** Are you aware of any clean up, repairs, or remediation of the Property due to any of the substances, materials, or products listed in the subsection above?........................................................................ ☐ ☑ ☐

**e.** If you answered YES to any of the above, please explain. _____

### 10. FLOOD

**a.** Is any portion of the Property in a special flood hazard area?.............. ☑ ☐ ☐

**b.** Are there any improvements, including additions, that are located below the base flood elevation?........................................................ ☐ ☑ ☐

**c.** Does the Property require flood insurance?.............................. ☑ ☐ ☐

**d.** Is any portion of the Property seaward of the Coastal Construction Control Line?................................................................... ☐ ☑ ☐

**e.** Do you currently have flood insurance?.................................. ☐ ☑ ☐

**f.** Do you know of any past or present drainage or flood problems affecting the Property or adjacent properties?......................................... ☑ ☐ ☐

**g.** Have you ever filed any insurance claim(s) regarding any of the above?....... ☐ ☑ ☐

**h.** If you answered YES to any of the above, please explain. _____
    _de not have flood insurance_

### 11. ELECTRICAL SYSTEM

**a.** Are you aware of any damaged or malfunctioning switches, receptacles, or wiring?................................................................ ☐ ☑ ☐

**b.** Are you aware of any conditions that materially affect the safety or operating capacity of the electrical system?...................................... ☐ ☑ ☐

**c.** Does the property have aluminum wiring?................................ ☐ ☑ ☐

**d.** If you answered YES to any of the above, please explain. _____

SELLER  D.B.    4 of 7    BUYER _____

Revised: 04/2020

dotloop signature verification:

## 12. HEATING AND A/C SYSTEMS

| | YES | NO | NOT KNOWN |
|---|---|---|---|

a. Air Conditioning. 2013 ...... ☑ Central ☐ Mini-Split ☐ Window
b. Number of Units __1__ Age in years of Unit 1 ____ Unit 2 ____ Unit 3 ____
c. Heating:   ☐ Fuel ☑ Electric ☐ Natural Gas ☐ Propane ☐ Other
d. Fireplace:  ☐ Wood Burning   ☐ Natural Gas ☐ Propane ☐ Other
e. Are there any defects regarding these items?....................................☐   ☑   ☐
f. If you answered YES to any of the above, please explain._____
_____

## 13. PLUMBING SYSTEM

a. What is your drinking water source? ☑Public ☐Private ☐Well on Property
b. If your drinking water is from a well, when was the water last checked for safety?_____
c. Was there a problem indicated as a result of the water test?......................☐   ☐   ☐
d. What is the irrigation system water source?
   ☑Public   ☐Reclaimed   ☐ Other
e. What is the type of sewage system?
   ☐Public   ☐ Private   ☑Septic   ☐Other
f. Are there Polybutylene Pipes on the Property?.......................................☐   ☑   ☐
g. Are there any septic tanks or wells on the Property currently not in use?.......☐   ☑   ☐
h. If there is a Septic Tank, when was it last serviced? 2016
i. Do you know of any leaks, backups, or other problems relating to plumbing, water or sewage related items?............................................................☐   ☑   ☐
j. Have you ever filed any insurance claim(s) regarding any of the above?.......☐   ☑   ☐
k. If you answered YES to any of the above, please explain._____
_____

## 14. OTHER EQUIPMENT AND APPLIANCES

| | | | |
|---|---|---|---|
| Range: | ☐Gas | ☑Electric | ☐Other |
| Water Heater: | ☐Gas | ☑Electric | ☐Other |
| Dryer Hook-up: | ☐Gas | ☑Electric | ☐Other |
| Water Softener: | ☐Leased | ☐Owned | |
| Water Heater: | ☐Leased | ☑Owned | |
| Solar Panels: | ☐Leased | ☐Owned | |

a. Are any of these items in need of repairs or replacement?..........................☐   ☑   ☐
b. If you answered YES to any of the above, please explain._____
_____

SELLER _____   5 of 7   BUYER_____ _____
Revised: 04/2020   dotloop verified

dotloop signature verification:

**15. ELECTRONIC SURVEILLANCE DEVICES**

|  | YES | NO | NOT KNOWN |
|---|---|---|---|
| **a.** Are there any interior and/or exterior cameras on the Property being monitored and/or recorded during showings?................................................ | ☑ | ☐ | ☐ |
| **b.** Are there any interior listening devices being monitored and/or recorded during showings?.......................................................................... | ☐ | ☑ | ☐ |

**c.** Is the Security System (including cameras): ☐Leased   ☐Owned   ☐Other

**d.** Please confirm what conveys._____

**16. POOL / HOT TUB / SPA**

**Note: Florida law requires swimming pools, hot tubs, and spas that received a certificate of completion on or after October 1, 2000 to have at least one safety feature as specified by Section 515.27, Florida Statutes.**

    **a.** Check all the pool safety features (As defined by Section 515.27, Florida Statutes). Your swimming pool, hot tub, or spa has:

        ☐ Enclosures that meet the pool barrier requirements
        ☐ Required door locks      ☐Required door & window exit alarms
        ☐ Approved safety pool cover    ☐None

|  | YES | NO | NOT KNOWN |
|---|---|---|---|
| **b.** Is there a pool heater?................................................................ ☐ | | ☐ | ☐ |
| **c.** Is the pool heater in working condition?................................................ ☐ | | ☐ | ☐ |
| **d.** Is there a spa heater?.................................................................. ☐ | | ☐ | ☐ |
| **e.** Is the spa heater in working condition?................................................ ☐ | | ☐ | ☐ |
| **f.** Is there a saltwater pool system?...................................................... ☐ | | ☐ | ☐ |

**g.** Is the saltwater pool system:    ☐Owned    ☐Leased

|  | YES | NO | NOT KNOWN |
|---|---|---|---|
| **h.** Has an in-ground pool on the Property been demolished and/or filled?......... ☐ | | ☐ | ☐ |
| **i.** Are you aware of any conditions regarding these items that materially affect the value of the Property?................................................................. ☐ | | ☐ | ☐ |

**j.** If you answered YES to **h.** and/or **i.**, please explain._____

**17. OTHER MATTERS**

    **a.** If there is anything else that may materially affect the value of the Property that is not readily observable, please explain._____
_____
_____
_____
_____
_____

**SELLER** _____   6 of 7   **BUYER**_____
**Revised:** 04/2020

dotloop signature verification:

## ACKNOWLEDGEMENT OF SELLER

The **Seller** represents that the information set forth in this disclosure statement is accurate and complete to the best of the **Seller's** knowledge on the date signed below. **Seller** does not intend for this disclosure statement to be a warranty or guaranty of any kind. **Seller** hereby authorizes disclosure of the information contained in this disclosure statement to prospective buyers of the Property. **Seller** understands and agrees that **Seller** will notify the **Buyer** and Broker in writing within 5 business days after **Seller** becomes aware that any information set forth in this document has become inaccurate in any way during the term of the listing or a pending purchase by a buyer.

SELLER: _Dianne Barker_          Date: _10 - 1 - 2021_

SELLER: _____          Date: _____

## RECEIPT AND ACKNOWLEDGEMENT OF BUYER

**Seller** is using this form to disclose **Seller's** knowledge of the condition of the real property improvements located on the Property as of the date signed by the **Seller**. This disclosure form is not a warranty of any kind. The information contained in this disclosure is limited to information which the **Seller** has knowledge. It is not intended to be a substitute for any inspections or professional advice the **Buyer** may wish to obtain. An independent professional inspection is strongly encouraged and may be helpful to verify the condition of the property and to determine the cost of repairs, if any. **Buyer** acknowledges and agrees that these representations are not made by any real estate licensee(s).

BUYER: _William T Jakob_   dotloop verified   Date: _____
                           10/25/21 11:58 AM
                           EDT
                           NJ6-EAWQ-XBR-KSNV

BUYER: _____          Date: _____

SELLER _____          7 of 7          BUYER _____
Revised: 04/2020

dotloop signature verification:

Additional Info # 8 SPD:

During a very heavy rain the water runs off the roof shedding towards the canal. When it reaches the back of the house the water pools up under the back porch. This area was 10 inches lower than the ground outside the porch. You can see the algae on the rocks and wall where the water would pool up then intrude into the storage under the home. I do not believe this depression was any type of sinkhole as it was dug perfectly shaped under the porch. I believe this was used as fill when the home was raised in 1994. I had the wall bleached killing the old green algae, scrapped and sealed with a concrete and masonry sealer called Dryloc. I then had 2 truckloads of dirt brought in filling in this depression.

See the photos of the repair:



dotloop signature verification:



dotloop signature verification:



dotloop signature verification:



dotloop signature verification:

